# In the
# United States Court of Appeals
## For the Seventh Circuit

_____

No. 04-2506

WILLIAM T. KILLMAN,

*Petitioner*,

v.

DIRECTOR, OFFICE OF WORKERS' COMPENSATION
PROGRAMS, UNITED STATES DEPARTMENT OF LABOR,
and SAHARA COAL TRUST,

*Respondents.*

_____

Petition for Review of an Order of the Benefits Review Board,
United States Department of Labor.
No. 99-BLA-0760.

_____

ARGUED JANUARY 26, 2005—DECIDED JULY 19, 2005

_____

Before POSNER, MANION, and WOOD, *Circuit Judges.*

WOOD, *Circuit Judge.* William Killman worked for twenty-three years for the Sahara Coal Company (Sahara), eventually rising to the position of foreman. He retired from mining at the end of September, 1984; about six months later, he began his quest for black lung disability benefits under the Black Lung Benefits Act. After several hearings, appeals to the Benefits Review Board ("the Board"), remands, and rehearings, an ALJ ultimately denied benefits and the Board affirmed. Killman petitions for review of this

decision. Because the ALJ never definitively resolved what the exertional requirements of Killman's job were, and he never ensured that the physicians on whom he relied had based their opinions on the correct exertional requirements, we grant the petition for review and vacate and remand the Board's decision.

# I

For fourteen years of his tenure with Sahara, Killman worked as a mine foreman. Along the way, he developed unspecified respiratory problems and apparently suffered a heart attack. On February 19, 1985, more than twenty years ago, Killman filed a claim for black lung disability benefits. The Department of Labor denied the claim, leading to a hearing before an ALJ in 1987.

In a 1988 decision, the ALJ ruled in Killman's favor, crediting the testimony of physicians who had concluded that Killman was disabled as a result of black lung disease. The ALJ ordered Sahara (whose liabilities in this respect later were transferred to the Sahara Coal Trust) to pay benefits under the Black Lung Benefits Act retroactive to 1985. The ALJ determined that medical test results alone did not support a diagnosis of pneumoconiosis (black lung disease), but correctly noted that notwithstanding negative x-rays, a diagnosis may be confirmed by a physician "exercising sound medical judgment." The ALJ credited the testimony of three doctors, each of whom diagnosed Killman with black lung disease, and accordingly found that Killman had "established the existence of pneumoconiosis." The ALJ further found that Killman's disability was "total," noting that all of the testifying physicians agreed that Killman was disabled in that he could not perform the tasks of his last job as foreman with Sahara.

Sahara and the Department of Labor appealed the ALJ's decision to the Benefits Review Board, which in 1993 partly

vacated the order and remanded the case for further consideration on the question whether Killman was totally disabled because of pneumoconiosis. The Board found fault with the ALJ's reliance on medical testimony that did not consider Killman's smoking habit or history of heart disease as potential causes of disability. Based on these errors, as well as other concerns over the ALJ's use of medical testimony, the Board sent the case back to the ALJ "to reconsider the evidence and first determine whether claimant has established a totally disabling respiratory impairment" resulting from pneumoconiosis.

On remand, the ALJ reviewed the medical testimony and concluded that some of the medical tests underlying the earlier result were invalid. Relying on the changed factual background, he denied Killman's claim for benefits. The ALJ acknowledged that the medical testimony on which he had relied in his earlier order was "not well reasoned" because there was no indication of how the doctors who found Killman disabled could have reached their conclusion without using the faulty tests. This time around, the ALJ credited the testimony of two doctors who opined that Killman suffered from at most a mild respiratory impairment that would not prevent him from carrying out his tasks as foreman. Killman appealed this decision, and in 1994 the Board affirmed. The Board found that the ALJ "properly considered all relevant evidence of record" and properly relied on the medical testimony indicating that Killman's ailment was not totally disabling.

In 1997, Killman filed a new claim for benefits. A different ALJ handled this filing and characterized it as duplicative. This meant that, in order to be awarded benefits, Killman would have to show that there had been a material change in his condition. See *Sahara Coal Co. v. OWCP, U.S. Dept. of Labor*, 946 F.2d 554 (7th Cir. 1991). Because the earlier decision had established that Killman was suffering from pneumoconiosis, this ALJ determined that Killman

would have to "establish a material change in condition with respect to disability." Practically speaking, Killman had the burden of showing that he had become totally disabled in the time since his original claim was denied in order to qualify for black lung benefits.

Under the relevant regulations, a claimant can show total disability "if a physician exercising reasoned medical judgment . . . concludes that the claimant's respiratory or pulmonary condition prevents or prevented the miner from engaging in employment as described in paragraph (b)(1) of this section." 20 C.F.R. § 718.204(c)(4). The regulation specifies that a miner is totally disabled if his respiratory or pulmonary condition is in itself enough to prevent him from "performing his or her usual coal mine work." 20 C.F.R. § 718.204(c)(4). The ALJ's decision therefore turned on medical opinions on the question whether Killman's respiratory problems prevented him from working in the job of mine foreman that he had held.

The testimony of four doctors was particularly important to the case. These doctors based their opinions on medical tests and examinations done both before and after the previous hearings. While many doctors provided testimony and reports over the history of this case, the ALJ relied principally on the testimony of Drs. Tuteur, Dahhan, Renn, and Cohen. Each of these doctors examined Killman at various times during the adjudication of his claim for benefits. Moreover, these doctors shared consultative reports with each other and reviewed each others' conclusions. In the end, Drs. Tuteur, Dahhan, and Renn concluded that Killman was not totally disabled; only Dr. Cohen determined that he was.

Drs. Tuteur, Dahhan, and Renn each diagnosed Killman with a mild "obstructive defect" attributable to smoking rather than pneumoconiosis. Dr. Cohen, in contrast, found that Killman was totally disabled, and attributed this prim-

arily to coal dust exposure. Dr. Cohen thought that Killman's smoking habit was at best a contributory factor. The ALJ was impressed by Drs. Tuteur, Dahhan, and Renn, describing their opinions as "well reasoned, well documented, supported by the evidence, and entitled to substantial weight." In contrast, the ALJ conceded that "Dr. Cohen has some expertise in this area," but he declined to credit Dr. Cohen's opinion in the face of the assessment of the other three and the fact that none of the medical tests produced results that clearly qualified Killman as disabled under 20 C.F.R. § 718.204(b)(2)(i), (ii). The ALJ concluded, "After weighing all of the new medical evidence and placing greater weight on the three opinions by Drs. Tuteur, Dahhan, and Renn, I find that the evidence does not establish a material change in condition." Accordingly, the ALJ denied Killman's claim for black lung benefits.

Killman again appealed the denial to the Board, which vacated the order after finding that the ALJ "did not address the contention below that Drs. Renn, Dahhan, and Tuteur did not understand the exertional requirements" of the job that all three agreed he would be able to perform. The Board found that Killman's duties as foreman included inspecting eight different mine faces, which required him to walk 960 feet in 20 minutes "while bent over in low coal and carrying approximately thirty pounds of equipment." In addition, the Board noted that Killman was responsible for assisting with a variety of tasks around the mine site, such as lifting oil barrels and changing tires. The Board was troubled by the failure of Drs. Tuteur, Dahhan, and Renn to demonstrate an awareness of these duties. According to the Board, these physicians either did not discuss Killman's duties or were under the impression that those duties were light. The Board also noted that the ALJ did not make a finding about the range of Killman's duties as a foreman. The Board held that the ALJ "should not have assessed the physicians' reasoning based solely on the non-qualifying

nature of the claimant's objective tests," citing *Poole v. Freeman United Coal Mining Co.*, 897 F.2d 888, 894 (7th Cir. 1990). The Board remanded the case to the ALJ "to consider the evidence regarding the exertional requirements of claimant's usual coal mine work as a foreman, to make a finding as to the nature of that work, and then to reweigh the new medical opinion evidence to determine whether claimant's respiratory impairment prevents him from performing that work."

On remand, the ALJ focused on the various doctors' understanding of Killman's duties. Dr. Cohen described Killman's duties in the greatest detail, such as specifying the distances Killman was required to walk and the loads he was required to carry. The other doctors, including Drs. Tuteur, Renn and Dahhan, "reviewed" Dr. Cohen's reports, which the ALJ understood to mean that they read the job requirements "as written and understood by Dr. Cohen." Some of Dr. Cohen's conclusions, however, were erroneous. Dr. Cohen mistakenly wrote in an early report that Killman "was required to walk 60 feet every 20 minutes to one of the eight face areas for inspection." The other physicians, having reviewed Dr. Cohen's early report, repeated this error in their own testimony.

The ALJ comprehensively reviewed and recited the various physicians' understanding of Killman's work requirements, but then he expressed some confusion about what he was expected to do with this information. He acknowledged that the Board expected him "to consider the evidence regarding the exertional requirements of the Claimant's usual coal mine work as a foreman, to make a finding as to the nature of that work, and then to reweigh the new medical opinion evidence" in order to determine whether Killman was totally disabled, but he refused to do so, stating:

> If the Board means that the Administrative Law Judge is to substitute his opinion for that of the physician, where the physician has an adequate understanding of

> the Miner's job duties, in determining whether the Miner's job duties are mild, moderate, or strenuous, I decline to do so. For the Administrative Law Judge to take such action would substitute his opinion for that of the physician. Although the weighing of the evidence is for the Administrative Law Judge, the interpretation of medical data is for the medical experts. Accordingly, it is error for an Administrative Law Judge to interpret medical tests and thereby substitute an adjudicator's conclusions for those of the physician.

Accordingly, the ALJ found that Killman had not established a material change in his condition and was not entitled to black lung benefits. The ALJ based this decision on "the reports of the physicians, the qualifications of the physicians, the reasoning of the physicians and the objective tests on which they relied."

Once again, Killman appealed, and a divided Board affirmed the ALJ's order as supported by substantial evidence. The Board held that the ALJ's decision met this standard in that he "extensively discussed the job duties and exertional requirements of claimant's usual coal mine employment," and that four of the five physicians, including two examining physicians, concurred that Killman was not totally disabled. One administrative appeals judge dissented on the ground that the ALJ "has failed to comply with the Board's remand instructions to determine the exertional requirements of claimant's usual coal mine work as a foreman and then to reconsider the entirety of new medical opinion evidence in light of that finding." According to the dissent, the ALJ may have discussed Killman's job duties, but he "failed to make the findings mandated by the Board." The dissent also pointed out that "none of the physicians, including Dr. Cohen, demonstrated knowledge of all the exertional requirements of claimant's coal mine employment, as set forth in the administrative law judge's decision and order and recounted in employer's brief." The

dissent cited *Cornett v. Benham Coal Co., Inc.*, 227 F.3d 569, 578 (6th Cir. 2000), for the proposition that "even a 'mild' respiratory impairment may preclude the performance of the miner's usual duties, depending on the exertional requirements of the miner's usual coal mining employment." The dissent recommended that the Board vacate the ALJ's order and remand the case for further consideration.

Upon Killman's motion, the Board reheard the appeal en banc. This time, four administrative appeals judges heard the case; two voted to affirm the denial of benefits and two dissented. Because a majority consisting of at least three Board members would have been required to overturn the panel's decision, 20 C.F.R. § 802.407(d), this was insufficient to reverse the original panel. The prevailing opinion offered little that was new, and the dissent reiterated the problems with the inaccuracies and lack of attention to the exertional requirements of Killman's job. Killman then petitioned for review in this court.

## II

In order to demonstrate changed circumstances, Killman must show that he has become totally disabled. *Midland Coal Co. v. Director, Office of Workers' Comp. Programs*, 358 F.3d 486 (7th Cir. 2004). The regulations recognize four ways for a claimant to do this. See 20 C.F.R. § 718.204(b)(2)(iv). Because Killman's medical tests did not produce qualifying results under three of the methods, only one way remains for him: "if a physician exercising reasoned medical judgment, based on medically acceptable clinical and laboratory diagnostic techniques, concludes that a miner's respiratory or pulmonary condition prevents or prevented" him from performing his usual coal mining work. 20 C.F.R. § 718.204(b)(2)(iv).

This court reviews the ALJ's decision, not the Board's, "to determine if it was rational, supported by substantial

evidence on the record as a whole, and not contrary to law." *Kennellis Energies, Inc. v. Hallmark*, 333 F.3d 822, 826 (7th Cir. 2003). Killman criticizes the ALJ's decision on a number of grounds. He cites *Poole v. Freeman United Coal Mining Co.*, 897 F.2d 888, 894 (7th Cir. 1990), for the proposition that "the ALJ must first determine the nature of the claimant's usual coal mine work and then compare evidence of the exertional requirements of the work with medical opinions as to the claimant's work capability." *Poole* reaches this conclusion in the limited context of an ALJ's characterization of medical opinions that do not explicitly use the statute's terminology of "total disability." *Poole*, 897 F.2d at 894. There is no hard and fast requirement that an ALJ make an explicit finding about the claimants' exertional requirements, but Killman persuasively argues that an ALJ may not reasonably rely on medical opinions that are predicated on a misunderstanding of the claimant's job requirements.

Whether the particular physicians' opinions relied upon by the ALJ constitute substantial evidence depends on whether those physicians understood the work require- ments that they presumed Killman could fulfill. The ALJ refused to make a finding about their understanding of what the job required, despite the Board's mandate, writing that the ALJ could not "substitute his opinion for that of the physician, *where the physician has an adequate understand- ing of the Miner's job duties . . .*" (emphasis added). The emphasized phrase must mean that the ALJ thought that the physicians adequately understood Killman's duties. Unfortunately, we cannot tell definitely whether that is the case, or what the ALJ thought the proper understanding of those duties was. In order to eliminate doubt on this crucial factual point, the ALJ should have summarized the testi- mony on the requirements of Killman's job and then directly asked each doctor whether he could perform that work.

We find it hard to believe that Drs. Tuteur, Dahhan, and Renn fully appreciated the nature of Killman's job, as he described it in uncontradicted testimony. The physicians who concluded that Killman was not disabled either mis-stated Killman's tasks or did not discuss them at all. The ALJ noted repeatedly that the other physicians' under-standing of Killman's exertional requirements was "as complete as Dr. Cohen's," and that they had reviewed Dr. Cohen's summaries, but at least one of Dr. Cohen's summaries was inaccurate. Dr. Cohen wrote that Killman was required to walk "60 feet every 20 minutes to one of the 8 face areas," but Killman had testified that he had to walk as much as 960 feet in that period of time. Dr. Cohen's erroneous characterization appeared in the report on which Dr. Renn relied and which he quoted in his testimony, and apparently it formed the basis of the other doctors' under-standing of the facts. Furthermore, even if the other doctors had made it clear that they had reviewed all of Dr. Cohen's reports, we still have no way of knowing whether they understood the underlying factual background. Logically, it is likely that the doctors paid more attention to Dr. Cohen's medical opinion than to his account of the details of Killman's work history.

It may be that the physicians would be just as sure that Killman could walk 960 feet hunched over in a mine in 20 minutes as they were that he could walk 60 feet in a normal posture. It may also be that the ALJ did not credit Dr. Cohen's diagnosis at all, which would defeat Killman's claim because Dr. Cohen was the only physician who found him to be totally disabled, a requirement under 20 C.F.R. § 718.204(b)(2)(iv). If the ALJ's opinion established either of these possibilities, then it could be reasonable and well supported. The ALJ, however, explicitly based his opinion on the medical opinions that Killman was not disabled:

> As stated in my prior Decision and Order, after review
> of all of the recent medical evidence, including pulmo-

nary function studies, arterial blood gas studies, *and the medical reports of Drs. Tuteur, Renn, Dahhan, Baker, and Cohen*, I find that the Claimant has not established total disability and has, therefore, not shown a material change in condition. My Decision is *based on the reports of the physicians*, the qualifications of the physicians, *the reasoning of the physicians* and the objective tests on which they relied. (Emphasis added.)

The ALJ's refusal or inability to confirm that the physicians understood Killman's job casts doubt on the sufficiency of those physicians' opinions as a basis for his opinion. Because the ALJ's order is not supported by substantial evidence, we GRANT the petition for review, VACATE the Board's decision and REMAND this matter for further consideration.

A true Copy:

     Teste:

                    _____

                    *Clerk of the United States Court of Appeals for the Seventh Circuit*