**PUBLISH**

UNITED STATES COURT OF APPEALS

FOR THE TENTH CIRCUIT
_____

ROCKWOOD CASUALTY INSURANCE
COMPANY, insurer of Hidden Splendor
Resources, Inc.,

    Petitioner,

v.

DIRECTOR, OFFICE OF WORKERS'
COMPENSATION PROGRAMS,
UNITED STATES DEPARTMENT OF
LABOR; TONY KOURIANOS,

    Respondents.

No. 18-9520

_____

**Petition for Review from an Order of the Benefits Review Board**
**(Benefits No. 17-0323 BLA)**
_____

Cheryl L. Intravaia, Feirich/Mager/Green/Ryan, Carbondale, Illinois, for Petitioner.

Victoria S. Herman (Joseph E. Wolfe, with her on the brief), Wolfe Williams &
Reynolds, Norton, Virginia, for Tony N. Kourianos, Respondent.

William M. Bush (Kate S. O'Scannlain, Solicitor of Labor, Kevin Lyskowski, Associate
Solicitor, Gary K. Stearman, Counsel for Appellate Litigation, and Rita A. Roppolo,
Attorney, on the brief), U.S. Department of Labor, Washington, D.C., for Director, Office
of Workers' Compensation Programs, Respondent.

_____

Before **BRISCOE**, **MATHESON**, and **BACHARACH**, Circuit Judges.

_____

**MATHESON**, Circuit Judge.

_____

Congress enacted the Black Lung Benefits Act ("BLBA"), 30 U.S.C. §§ 901-944, in 1969 to compensate miners with pneumoconiosis, commonly known as "black lung disease." *Antelope Coal Co./Rio Tinto Energy Am. v. Goodin*, 743 F.3d 1331, 1335 (10th Cir. 2014). The BLBA provides benefits to coal miners who become totally disabled from pneumoconiosis caused by their mining work. *Id.*

Tony N. Kourianos worked as a coal miner for more than 27 years before filing a claim for benefits under the BLBA. His claim was reviewed through a three-tiered administrative process. Ultimately, the Benefits Review Board ("BRB") found that he was entitled to benefits. The BRB also found that Mr. Kourianos's last employer, Hidden Splendor Resources, Inc. ("Hidden Splendor"), was the "responsible operator" liable for paying those benefits. Hidden Splendor's insurer, Rockwood Casualty Insurance Company ("Rockwood"), petitions this court for review of the BRB's decision. Along with Mr. Kourianos, the Director of the Office of Workers' Compensation Programs ("OWCP" or "Director") is a respondent in this case. *See* 20 C.F.R. § 725.360(a)(5) (stating that the Director will be a party "in all proceedings relating to a claim for benefits").

2

Rockwood challenges the BRB's decision on two grounds. First, it argues the BRB incorrectly affirmed the administrative law judge's ("ALJ") decision prohibiting Hidden Splendor from withdrawing its responsible operator stipulation. Second, it argues the BRB incorrectly found that Mr. Kourianos was totally disabled and entitled to benefits.

Exercising jurisdiction under 30 U.S.C. § 932(a) and 33 U.S.C. § 921(c), we deny Rockwood's petition.

## I. BACKGROUND

We describe the legal framework governing Mr. Kourianos's claim for benefits and then recount the specific factual and procedural history of his case.

### A. *Legal Background*

A claim for BLBA benefits contemplates two critical questions. First, which operator is responsible for paying benefits under the BLBA? Second, is the claimant entitled to benefits under the Act? The following presents the law applicable to these two questions and the Department of Labor's three-tiered administrative process for deciding BLBA claims.

### 1. The Responsible Operator Determination

The BLBA provides that individual coal mine operators are liable for a miner's benefits if the miner's disability or death arose "at least in part" from coal mine

3

employment with the operator.  30 U.S.C. § 932(c); 20 C.F.R. § 725.494(a).[1]  To ensure coal mine operators can pay their miners' benefits, Congress imposed workers' compensation insurance requirements on them.  30 U.S.C. § 933(a); 20 C.F.R. § 726.1.  As a fallback alternative, Congress created the Black Lung Disability Trust Fund, which assumes liability for miners' benefits if "there is no operator who is liable for the payment of such benefits."  26 U.S.C. § 9501(d)(1)(B).

To implement the BLBA, Congress directed the Department of Labor to promulgate regulations "for determining whether pneumoconiosis arose out of employment in a particular coal mine or mines."  30 U.S.C. § 932(h).  Under the regulations, a coal mine operator is a "potentially liable operator" if (i) the miner's disability or death arose out of employment with the operator; (ii) the entity was an operator after June 30, 1973; (iii) the miner worked for the operator for at least one year; (iv) the miner's employment with the operator included at least one working day after December 31, 1969; and (v) the operator is financially capable of assuming liability for the claim.  20 C.F.R. § 725.494(a)-(e).  The regulations state that the "operator responsible for the payment of benefits . . . shall be the potentially liable operator . . . that most recently employed the miner."  *Id.* § 725.495(a)(1).

---

[1] Because Mr. Kourianos filed his claim after January 19, 2001, the current version of the BLBA regulations apply to his claim.  20 C.F.R. § 725.2 ("This part applies to all claims filed after January 19, 2001 and all benefits payments made on such claims."); *see Antelope Coal*, 743 F.3d at 1341-42 (holding that 2013 amendments to BLBA regulations applied retroactively to claim filed before amendments were promulgated); *see also Consolidation Coal Co. v. Dir., OWCP*, 864 F.3d 1142, 1151 (10th Cir. 2017).

4

The BLBA defines a miner as "any individual who works or has worked in or around a coal mine or coal preparation facility in the extraction or preparation of coal." 30 U.S.C. § 902(d); *see also* 20 C.F.R. § 725.202(a). To meet the statutory definition of a "miner," the claimant must establish that he or she (1) worked "in or around a statutorily defined coal mine (the 'situs' test)," and (2) performed "duties involv[ing] the extraction or preparation of coal, or involv[ing] appropriate coal mine construction or transportation (the 'function' test)." *Falcon Coal Co. v. Clemons*, 873 F.2d 916, 921 (6th Cir. 1989) (citing 30 U.S.C. § 802(h)(2) and surveying case law).[2]

In sum, under the BLBA, the responsible operator is the last coal mine operator to have employed the claimant as a "miner" for more than one year. 20 C.F.R. §§ 725.494(c), 725.495(a)(1).

2. **The Benefits Determination**

To obtain benefits under the BLBA, a claimant must prove

> (1)  he or she suffers from pneumoconiosis (disease),
>
> (2)  the pneumoconiosis arose out of coal mining employment (disease causation),
>
> (3)  he or she is totally disabled due to a respiratory or pulmonary impairment (disability), and
>
> (4)  pneumoconiosis is a substantially contributing cause of the total disability (disability causation).

---

[2] We applied the "situs" and "function" tests in *Wackenhut Corp. v. Hansen ex rel. Hansen*, 560 F. App'x 747, 750 (10th Cir. 2014) (unpublished) (cited for persuasive value under Fed. R. App. P. 32.1, 10th Cir. R. 32.1).

*Energy W. Mining Co. v. Estate of Blackburn*, 857 F.3d 817, 822 (10th Cir. 2017); *see also* 30 U.S.C. §§ 902, 921; 20 C.F.R. §§ 725.202(d)(2), 718.204(c)(1).

Below, we discuss four additional aspects of a BLBA claim: (a) the "15-year presumption," (b) the difference between clinical and legal pneumoconiosis, (c) the 10-year presumption and the disease causation element, and (d) the showing necessary to demonstrate a "total disability."

a. *The 15-year presumption and rebuttal*

The BLBA created a rebuttable "presumption that a miner is disabled due to pneumoconiosis when he or she has worked for 15 years in underground coal mines or substantially similar conditions and is totally disabled from a respiratory or pulmonary condition (the '15-year presumption')." *Antelope Coal*, 743 F.3d at 1335; *see* 30 U.S.C. § 921(c)(4). "In other words, a miner who proves 15 years of coal mine work and total disability is entitled to a presumption that the remaining elements of his claim are established." *Antelope Coal*, 743 F.3d at 1335; *see Blackburn*, 857 F.3d at 822 (stating that a claimant's burden is "soften[ed]" when he has worked for at least 15 years as a miner).

The party opposing an award of benefits under the BLBA may rebut the 15-year presumption by establishing that (1) the claimant does not have pneumoconiosis or (2) pneumoconiosis did not cause any part of the miner's respiratory or pulmonary total disability. 20 C.F.R. § 718.305(d). In other words, once a claimant establishes the

6

15-year presumption, the operator must rebut the existence of (1) the disease, or (2) the disease or disability causation. *Blackburn*, 857 F.3d at 822. "The presumption must not be considered rebutted on the basis of evidence demonstrating the existence of a totally disabling obstructive respiratory or pulmonary disease of unknown origin." 20 C.F.R. § 718.305(d).

b. *Clinical and legal pneumoconiosis*

"The BLBA recognizes two types of pneumoconiosis: clinical and legal." *Antelope Coal*, 743 F.3d at 1335. The 15-year presumption applies to both classifications of the disease. *Consolidation Coal Co. v. Dir., OWCP*, 864 F.3d 1142, 1144 (10th Cir. 2017).

Clinical pneumoconiosis refers to diseases the medical community has recognized as pneumoconiosis, including "conditions characterized by . . . the fibrotic reaction of the lung tissue to . . . deposition [of particulate matter] caused by dust exposure in coal mine employment." 20 C.F.R. § 718.201(a)(1).

Legal pneumoconiosis, on the other hand, is defined as any "chronic dust disease of the lung and its sequelae, including respiratory and pulmonary impairments, arising out of coal mine employment." 30 U.S.C. § 902(b); *see* 20 C.F.R. § 718.201(a)(2) ("This definition includes, but is not limited to, any chronic restrictive or obstructive pulmonary disease arising out of coal mine employment."). To show legal pneumoconiosis, a claimant therefore "must satisfy both the *Disease* and *Disease causation* elements" of a BLBA claim. *Blackburn*, 857 F.3d 817. Legal pneumoconiosis encompasses "a broader

7

class of lung diseases that are not pneumoconiosis as the term is used by the medical community." *Andersen v. Dir., OWCP*, 455 F.3d 1102, 1104 (10th Cir. 2006). In other words, a claimant may have legal pneumoconiosis without ever receiving a formal medical diagnosis of "pneumoconiosis." *See id.*

       c. *The 10-year presumption and disease causation*

The 15-year presumption establishes the second element of a BLBA claim—the pneumoconiosis arose out of coal mining employment. *See Blackburn*, 857 F.3d at 822. The second element also may be established under the BLBA's 10-year presumption. *See* 30 U.S.C. § 921(c)(1).

"Arising out of coal mine employment" means the relevant lung disease or impairment is "significantly related to, or substantially aggravated by, dust exposure in coal mine employment." 20 C.F.R. § 718.201(b). "If a miner who is suffering or suffered from pneumoconiosis was employed for ten years or more in one or more coal mines there shall be a rebuttable presumption that his pneumoconiosis arose out of such employment." 30 U.S.C. § 921(c)(1); *see* 20 C.F.R. § 718.203(b). The 10-year presumption overlaps with the 15-year presumption because both presumptions shift the burden to the employer to submit evidence to disprove that a claimant's pneumoconiosis arose out of coal mine employment. Because the 15-year presumption addresses the element of disability causation in addition to disease causation, however, the 10-year presumption is effectively subsumed by the 15-year presumption.

8

d. *Total disability*

One of the elements to establish the 15-year presumption is proof of total disability from a respiratory or pulmonary condition.  A miner is considered "totally disabled" if he or she has "a pulmonary or respiratory impairment which," on its own, prevents the miner from (i) "performing his or her usual coal mine work" and (ii) "engaging in gainful employment in the immediate area of his or her residence requiring the skills or abilities comparable to those of any employment in a mine or mines in which he or she previously engaged with some regularity over a substantial period of time."  20 C.F.R. § 718.204(b)(1).

The BLBA regulations provide that a miner can qualify for a total disability determination by submitting evidence from (1) pulmonary function tests, (2) arterial blood gas tests, or (3) medical evidence of right-side congestive heart failure.  20 C.F.R. § 718.204(b).  In addition, when total disability cannot be shown by these three categories of testing, the regulations provide that "total disability may nevertheless be found if a physician exercising reasoned medical judgment, based on medically acceptable clinical and laboratory diagnostic techniques, concludes that a miner's respiratory or pulmonary condition prevents . . . the miner from engaging in [the claimant's usual] employment."  20 C.F.R. § 718.204(b)(2).  Arterial blood gas studies and medical opinions provide the key evidence of "impairment" in this case.

The BLBA regulations provide standards for evaluating arterial blood gas studies. *See* 20 C.F.R. pt. 718, App. C.  These standards are depicted in "Appendix C," which

9

"contains three tables of 'qualifying' values for arterial-blood gas studies . . . . A test that produces 'qualifying' values is deemed, in the absence of contrary evidence, indicative of a totally disabling respiratory or pulmonary impairment." Regulations Implementing the Byrd Amendments to the Black Lung Benefits Act: Determining Coal Miners' and Survivors' Entitlement to Benefits, 77 Fed. Reg. 19456, 19464 (Mar. 30, 2012).

Appendix C incorporates three categories of data: (1) the altitude at which the test was taken, (2) a partial pressure of oxygen ("PO2") reading, and (3) a partial pressure of carbon dioxide ("PCO2") reading. *See* 20 C.F.R. pt. 718, App. C. First, Appendix C consists of three charts, each based on a different altitude range and each with a different set of PO2 and PCO2 values: (1) 0 to 2,999; (2) 3,000 to 5,999; and (3) 6,000 or more feet above sea level. *Id.* Second, Appendix C compares the blood's carbon dioxide pressure levels (PCO2) with the oxygen pressure levels (PO2) to determine how fast the subject's lungs are producing oxygen. *See id.*; Suppl. App. 17-18. Third, at each PCO2 reading in the chart, Appendix C sets a "qualifying" PO2 value, below which the miner will be deemed impaired in the absence of contrary evidence. *Id.* For example, in the 3,000-to-5,999-foot altitude range, a claimant with a PCO2 level of 26 would qualify as "impaired" if his or her PO2 level was 69 or lower. We reproduce the chart for the 3,000-to-5,999 category below:

10

(2) For arterial blood-gas studies performed at test sites 3,000 to 5,999 feet above sea level:

| Arterial PCO2 (mm Hg) | Arterial PO2 equal to or less than (mm Hg) |
|---|---|
| 25 or below | 70 |
| 26 | 69 |
| 27 | 68 |
| 28 | 67 |
| 29 | 66 |
| 30 | 65 |
| 31 | 64 |
| 32 | 63 |
| 33 | 62 |
| 34 | 61 |
| 35 | 60 |
| 36 | 59 |
| 37 | 58 |
| 38 | 57 |
| 39 | 56 |
| 40–49 | 55 |
| Above 50 | (2) |

[2] Any value.

20 C.F.R. Pt. 718, App. C.

3. **Procedures for Claims Under the BLBA**

Claims under the BLBA are subject to three levels of administrative review.[3] First, the OWCP district director[4] receives and develops documentary evidence and issues a proposed decision and order ("PDO") regarding benefits and liability. 20 C.F.R. §§ 725.414, 725.418. Second, if a party wishes to challenge the PDO, it may request a hearing before an ALJ who reviews evidence—including oral testimony—and issues a

---

[3] The Secretary of Labor has a discretionary right to undertake a fourth level of review, but he did not do so here. *See* 20 C.F.R. § 726.317(a).

[4] The "district director" should not be confused with the Director of OWCP, the Department of Labor official charged with administering the BLBA program. *See* 20 C.F.R. § 1.1(a).

11

"decision and order." *Id.* §§ 725.419(a), 725.476. Third, a party dissatisfied with the ALJ's decision may appeal to the BRB, which reviews the hearing record for error and issues its own decision. 33 U.S.C. § 921(b)(3); 20 C.F.R. § 725.481. Aggrieved parties-in-interest may appeal BRB orders to an appropriate circuit court. *See* 33 U.S.C. § 921(c); 30 U.S.C. § 932(a); 20 C.F.R. § 725.482.

a. *District director review*

Once a miner files a claim for benefits under the BLBA, the OWCP district director investigates the claim and determines whether one or more operators are potentially liable. 20 C.F.R. § 725.407(a). The district director then notifies each potentially liable operator of the claim and sends "a copy of the claimant's application and a copy of all evidence obtained by the district director relating to the miner's employment." *Id.* § 725.407(c).

Each notified operator has 30 days to accept or contest its designation as a potentially liable operator. *Id.* § 725.408(a)(1). "If the operator contests its identification, it shall . . . state the precise nature of its disagreement" in its response. *Id.* § 725.408(a)(2). The operator may submit documentary evidence in support of its disagreement within 90 days of receiving the OWCP notice. *Id.* § 725.408(b)(1). The regulations further provide, "No documentary evidence relevant to [the operator's potential liability] may be admitted in any further proceedings unless it is submitted within" the 90-day time limit. *Id.* § 725.408(b)(2).

12

After receiving a potentially liable operator's response, the district director develops and reviews the relevant medical evidence and issues a "schedule for the submission of additional evidence" ("SSAE"), which includes a preliminary determination of the miner's entitlement to benefits. *Id.* § 725.410(a). The SSAE also states which of the potentially liable operators has been identified as the responsible operator for the claim. *Id.* § 725.410(a)(3). Once identified, the designated responsible operator has 30 days to accept or contest its designation. *Id.* § 725.412(a)(1). If the operator accepts its responsible operator designation or fails to file a timely response, the operator "shall be deemed to have accepted the district director's designation with respect to its liability, and to have waived its right to contest its liability in any further proceeding conducted with respect to the claim." *Id.* § 725.412(a)(2).

At the end of this initial level of proceedings, the district director makes a final recommendation of entitlement to benefits, designates the responsible operator, and issues a written proposed decision and order ("PDO"). 20 C.F.R. § 725.418(d). When it issues the PDO, the district director must "dismiss, as parties to the claim, all other potentially liable operators." *Id.*

b. A*dministrative law judge proceedings*

Parties-in-interest who wish to contest a PDO's findings or conclusions may request a hearing before an ALJ. *Id.* § 725.419(a). Upon receiving a party's request, the district director refers the case to the Office of Administrative Law Judges. *Id.* An ALJ then holds a formal hearing and may take oral testimony. *Id.* § 725.455. With one

13

exception not relevant here, "[t]he district director may not notify additional operators of their potential liability after a case has been referred to the Office of Administrative Law Judges." *Id.* § 725.407(d).

"Except as otherwise provided in this section, the hearing shall be confined to those contested issues which have been identified by the district director or any other issue raised in writing before the district director." *Id.* § 725.463(a) (citation omitted). One exception is critical here:

> *An administrative law judge may consider a new issue only if such issue was not reasonably ascertainable by the parties at the time the claim was before the district director.* Such new issue may be raised upon application of any party, or upon an administrative law judge's own motion, with notice to all parties, at any time after a claim has been transmitted by the district director to the Office of Administrative Law Judges and prior to decision by an administrative law judge. If a new issue is raised, the administrative law judge may, in his or her discretion, either remand the case to the district director with instructions for further proceedings, hear and resolve the new issue, or refuse to consider such new issue.

20 C.F.R. § 725.463(b) (emphasis added).

After the hearing, the ALJ issues a decision and order resolving the claim. *Id.* § 725.476.

c. *Proceedings before the BRB*

"Any party dissatisfied with a decision and order issued by an [ALJ] may . . . appeal the decision and order to the [BRB.]" *Id.* § 725.481. The BRB does not receive new evidence. 33 U.S.C. § 921(b)(3); 20 C.F.R. § 802.301(b). Instead, a panel of three

14

ALJs considers the record and issues a decision. *See* 20 C.F.R. §§ 802.301-802.309. The panel may hold oral argument, but it need not do so. *Id.* § 802.304. The Secretary of Labor has discretion to review the BRB's decisions. *Id.* § 726.317(a).

### B. *Procedural History*

In 2012, Mr. Kourianos's claim started making its way through the three-tiered administrative review outlined above.

### 1. **Proceedings Before the OWCP District Director**

After receiving the claim, the OWCP district director used Mr. Kourianos's Social Security earnings report to identify two potentially liable operators: Hidden Splendor and West Ridge Resources, Inc. Suppl. App. at 47-52.[5] The district director then sent each potentially liable operator a "Notice of Claim." *Id.* Hidden Splendor initially denied it was the responsible operator, arguing that it employed Mr. Kourianos as a miner for less than one year. Approximately one month after its initial response, however, Hidden Splendor filed an amended response admitting that it was "the responsible operator within the meaning of the [BLBA]." *Id.* at 58.

On February 6, 2013, approximately three months after its amended response, a Hidden Splendor "senior staff accountant" faxed the district director a document with the

---

[5] The Government filed a Supplemental Appendix ("Suppl. App.") containing the key documents from the administrative review process. Within the administrative record, we cite the director's exhibits as "DX" and the Employer's (Rockwood/Hidden Splendor's) exhibits as "EX." We cite the transcript of the ALJ's hearing as "ALJ Hrg. Tr."

heading "Hire Dates for Tony Kourianos." *Id.* at 46. The one-page document listed three periods of employment for Mr. Kourianos: (1) "December 26, 2006 to April 11, 2007 – In the Mine"; (2) "November 16, 2010 to January 21, 2011 – In the Mine"; and (3) "April 5, 2011 to October 14, 2011 – Outside at the Loadout." *Id.*

After reviewing the documentary evidence, the district director issued an SSAE, which made the following preliminary conclusions: (1) Mr. Kourianos "would be entitled to benefits if [the district director] issued a decision at this time," and (2) Hidden Splendor "is the responsible operator liable for the payment of benefits." *Id.* at 60. Hidden Splendor responded to the SSAE, stating, "You will find Hidden Splendor has accepted the designation of Responsible Operator but contests Claimant's entitlement for benefits." *Id.* at 73. The district director then issued its PDO, which adopted the preliminary conclusions in the SSAE and dismissed West Ridge as a potentially responsible operator.

Hidden Splendor sought ALJ review of the district director's determination that Mr. Kourianos was entitled to benefits. In its "statement of contested issues," Hidden Splendor "advise[d] the parties that [it] does *not* dispute its designation as the Responsible Operator in this claim." *Id.* at 83 (emphasis in original).

16

2. **Proceedings Before the ALJ**

The ALJ issued two orders, one confirming Hidden Splendor's designation as the responsible operator and a second finding Mr. Kourianos was entitled to benefits.

a. *Responsible operator determination*

The ALJ held a formal hearing in Price, Utah, on August 12, 2014. Mr. Kourianos testified and explained his job duties at Hidden Splendor. He testified that during the first two periods with the company listed on the staff accountant's fax, he worked as an instructor and a fire boss in the mine. During the last period of employment, however, he worked "at the loadout," Suppl. App. at 46, performing "night watchman" duties to ensure that people did not trespass or take materials from the mine. ALJ Hrg. Tr. at 51, 55. He noted that he did not mine or provide instruction to miners during that time. For some of his time as a night watchman, the mine was not operational.

Because Mr. Kourianos's testimony suggested that he did not work as a "miner" for a full year at Hidden Splendor, Rockwood's counsel moved to withdraw the stipulation that Hidden Splendor was the responsible operator for the claim. The ALJ permitted the parties to file supplemental briefing on whether Hidden Splendor should be allowed to withdraw its responsible operator stipulation.

The ALJ denied Rockwood's motion. He applied 20 C.F.R. § 725.463(b), which, as noted above, states that an ALJ "may consider a new issue only if such issue was not reasonably ascertainable by the parties at the time the claim was before the district director." Suppl. App. at 2-3. The ALJ found that the evidence of Mr. Kourianos's work

17

was "reasonably ascertainable" when the claim was pending before the district director, noting:

> While I appreciate that Claimant's testimony at the hearing concerning his job duties for Employer came as a surprise, I note that one significant piece of written documentation related to the [responsible operator] issue, the "Hire Dates for Tony Kourianos" fax, was submitted by Employer. Furthermore, this piece of evidence, which Employer states in its brief was prepared by Employer's "staff accountant," distinguished between the periods when Claimant worked "in the mine" and "at the Loadout." Thus, Employer might have ascertained what job duties Claimant performed, and thereby determined whether Hidden Splendor should have been named the [responsible operator], by interviewing its own agent regarding the evidence it submitted.

Suppl. App. at 3 (citations omitted).

b. *Entitlement to benefits*

The ALJ issued his Decision and Order on February 28, 2017. The order addressed the following issues:

(1)    The length of Mr. Kourianos's coal mine employment;

(2)    Whether Mr. Kourianos suffer[ed] from pneumoconiosis, as defined by the Act and regulations;

(3)    If so, whether Mr. Kourianos's pneumoconiosis arose from his coal mine employment;

(4)    Whether Mr. Kourianos [was] totally disabled; and

(5)    If so, whether Mr. Kourianos [was] totally disabled due to pneumoconiosis.

*Id.* at 7.

18

### i. Employment and smoking history

The ALJ found that Mr. Kourianos was a miner for 27.27 years.[6]  During this time, Mr. Kourianos "worked in various capacities as a coal miner," but his "usual coal mine work" was working as a "fire boss."  Suppl. App. at 14-15.  As a fire boss, Mr. Kourianos conducted frequent examinations of the mine and carried a tool belt that weighed at least 30 to 32 pounds.  Accordingly, the ALJ found that Mr. Kourianos's usual mine work qualified as "medium work" under 20 C.F.R. § 404.1567(c) (describing classifications of physical stress involved in different kinds of work).  The ALJ further found that Mr. Kourianos smoked an average of 7.5 cigarettes per day for approximately 44 years.

Rockwood's petition does not contest the ALJ's employment classification or Mr. Kourianos's smoking history.

### ii. Medical tests

The ALJ considered X-rays, which showed no pulmonary irregularities.  He also reviewed "pulmonary function tests," which likewise did not show evidence of legal pneumoconiosis.  *Id.* at 17.

---

[6] The ALJ did not include Mr. Kourianos's time as a Hidden Splendor "security guard" in this calculation.  Suppl. App. at 9.

The ALJ next examined Mr. Kourianos's "arterial blood gas studies," which measure the ability of the lungs to oxygenate blood. Under 20 C.F.R. § 718.204(b)(2)(ii), such tests may be used to establish total disability. The ALJ explained,

> A defect will manifest itself primarily as a fall in arterial oxygen tension either at rest or during exercise. The blood sample is analyzed for the partial pressure of oxygen ("PO2") and the partial pressure of carbon dioxide ("PCO2") in the blood. A lower level of oxygen ("O2") compared to carbon dioxide ("CO2") indicates a deficiency in the transfer of gases through the alveoli which may leave the miner disabled.

*Id.* at 17-18.

As discussed above, Appendix C provided the framework for the ALJ's analysis of Mr. Kourianos's arterial blood gas studies. 20 C.F.R. pt. 718, App. C. To read the results of these studies, the ALJ (1) selected the correct altitude range from Appendix C, (2) identified Mr. Kourianos's PCO2 readings, and (3) identified the threshold PO2 value corresponding to the PCO2 reading. If Mr. Kourianos's PO2 level was below the threshold value, he would qualify as "impair[ed]." *See id.* If it fell above the impairment threshold, he would not.

The ALJ considered results from two sets of Mr. Kourianos's arterial blood gas tests taken at Castleview Hospital in Price, Utah. Price sits at approximately 5,566 feet above sea level, and the tests therefore accounted for an altitude of 3,000-5,999 feet. Mr. Kourianos's 2010 test yielded a PO2 level of 60 at rest, which, when measured against his PCO2 level of 43, did not qualify him as impaired under Appendix C (the threshold impairment level was a PO2 level of 55). His 2012 test showed a resting PCO2 level of

20

39 and a corresponding PO2 level of 68, which also did not qualify him as impaired

under Appendix C because the threshold PO2 level was 56. *Id.* But the 2012 test

revealed a PO2 level of 59 after exercise, which fell below the threshold of 62 (at a PCO2

level of 33) announced in Appendix C and therefore qualified him as impaired. *Id.*

The ALJ detailed the results in the following chart:

| Exhibit/ Date of Test | Physician | Altitude (feet) | PCO$_2$ | PO$_2$ | Qualify? |
|---|---|---|---|---|---|
| DX 16 8/23/2012 | Dr. Gagon | 3,000-5,999 | 39 (resting) 33 (exercise) | 68 (resting) 59 (exercise) | No Yes |
| EX 8 at 72 5/26/2010 | Castleview Hospital | 3,000-5,999 | 43 (resting) | 60 (resting) | No |

Suppl. App. at 18.

### iii. Medical reports and opinions

The ALJ also considered reports and depositions from three doctors. Mr.

Kourianos selected Dr. Shane Gagon to perform the medical screening for his BLBA

claim. Rockwood engaged Drs. George Zaldivar and Jeff Selby to examine and comment

on Mr. Kourianos's medical records. Neither Dr. Zaldivar nor Dr. Selby examined Mr.

Kourianos in person.

In brief, Dr. Gagon concluded that Mr. Kourianos was totally disabled, while Drs.

Zaldivar and Selby opined that Mr. Kourianos did not suffer from pneumoconiosis and

was not totally disabled. Drs. Zaldivar and Selby further attributed Mr. Kourianos's

respiratory issues to his history of smoking, while Dr. Gagon believed that smoking and

21

coal mine work contributed equally to Mr. Kourianos's respiratory impairment. After

receiving Dr. Zaldivar's report, Dr. Gagon filed a supplemental report, discussed below.

> 1) Dr. Gagon

Dr. Gagon examined Mr. Kourianos in August 2012, conducted arterial blood gas

testing, and issued his report shortly thereafter. Dr. Gagon found that Mr. Kourianos

"suffered from moderate impairment with subjective chronic shortness of breath with

minimal exertion and PO2 with exercise." Suppl. App. at 18 (quotations omitted). He

diagnosed Mr. Kourianos with chronic bronchitis and a significant drop in PO2 levels

with exercise. Dr. Gagon concluded the bronchitis was likely caused by "coal dust

exposure and smoking" and that both factors "probably" contributed equally to the

impairment. *Id.* (quotations omitted).

Dr. Gagon initially opined that Mr. Kourianos "would be able to work in the coal

mine" but "not at the same degree with someone with no abnormalities" and "as long as

his job was fairly sedentary." Suppl. App. at 19 (quotations and brackets omitted). The

ALJ summarized Dr. Gagon's disability determination: "But based on Claimant's

description of the more physical job he performed in his usual coal mine work as a fire

boss . . . Claimant would not be able to perform the described job duties." *Id.*

Dr. Gagon performed the 2012 arterial gas tests on Mr. Kourianos. In his

deposition, Dr. Gagon affirmed that the results were "normal" for Price, Utah. EX 12

at 12. But he affirmed that "it was abnormal that the PO2s dropped" so much from

resting to exercise. *Id.*

22

Dr. Gagon submitted a supplemental report. It stated: (1) the blood gas studies took into account the altitude of Price, Utah; (2) the barometric pressure for the blood gas test was likely incorrect, but the error was probably a scrivener's error that would not change the results of the test; (3) the blood gas equipment reads the results of the test at the altitude of Price, Utah, and there had been no errors in the past; (4) "[t]he ABG values indicate hypoxemia with exercise meeting the requirements of disability set forth by Black Lung [regulations] at the altitude of Price, UT"; (5) Dr. Saldivar "seems to be contradicting himself" by stating that smoking was probably the cause of Mr. Kourianos's low O2 levels because, "with the miner's significant exposure to coal dust, this is also a significant contributing factor"; (6) Mr. Kourianos's bronchiolitis could be caused by coal dust or by smoking; (7) "Mr. Kourianos could work as long as the work is sedentary" but that "with his significant hypoxemia with exercise, he would be limited with any exertion"; and (8) "[b]ased on the table set forth [in Appendix C,] he meets the requirments [sic] of disability based on his hypoxemia at the altitude range of 3000-5999." Doc. 10612740 at 4-8.[7]

2) Dr. Zaldivar

Dr. Zaldivar did not examine Mr. Kourianos in person. The opinions in his report and deposition were based on a review of Mr. Kourianos's medical records, which did

---

[7] The Director submitted this document in response to this court's sua sponte order because it was missing from the original appendix.

not include a work history. Dr. Zaldivar stated, "My opinion[] considering the totality of the case is that pneumoconiosis is not present." Suppl. App. at 20 (quotations omitted). He said that "if there is any pulmonary condition at all, it is bronchiolitis caused by smoking." *Id.* (quotations omitted). In support, he explained that "coal miners are human beings subject to all diseases and conditions of human beings and are affected by habits such as smoking just as the population at large is affected by it." *Id.* (quotations omitted). Thus, if Mr. Kourianos suffered from chronic bronchitis, Dr. Zaldivar concluded that it was caused by smoking. *Id.* at 21.

Dr. Zaldivar also concluded that Mr. Kourianos was not disabled. In response to Dr. Gagon's report and Mr. Kourianos's arterial blood gas studies, Dr. Zaldivar acknowledged that Mr. Kourianos's blood gas PO2 levels appeared "very low" but noted they "were not [low] when taking into consideration the altitude of Price, UT." *Id.* at 19 (quotations omitted). He "explained that normal PO2 values are expected to drop linearly as altitude increases." *Id.* at 24. Therefore, as the ALJ recounted, Dr. Zaldivar opined that the Department of Labor regulations did not "accurately reflect the drop in PO2 values that occurs at higher altitudes." *Id.* at 21.

### 3) Dr. Selby

Dr. Selby also did not examine Mr. Kourianos. The ALJ noted that, after reviewing medical records, Dr. Selby similarly concluded that Mr. Kourianos "did not suffer from clinical or legal pneumoconiosis." *Id.* at 22. Dr. Selby acknowledged that the PO2 level was "a bit low at first glance at rest, and then the PO2 decreased with

24

exercise." *Id.* (quotations omitted). Like Dr. Zaldivar, he concluded that, given the altitude in Price, Utah, the range of disability "would be more accurately defined toward the PO2 of 57 value." *Id.* at 21 (quotations omitted). In other words, he believed that the Appendix C threshold was too high when applied to the altitude of Price.

Dr. Selby stated that the low PO2 values could be "undiagnosed asthma," "chronic bronchitis from smoking," or "congestive heart failure." *Id.* at 22 (quotations omitted). He also stated that the drop in Mr. Kourianos's PO2 values could mean he suffered from "some form of disease," but he discounted the severity of the disease because the PO2 levels were normal for the altitude of Price. *Id.* at 22 (quotations omitted). Dr. Selby also stated that "working in coal mines prohibits the inhalation of cigarette smoking, thus actually protecting the lungs." *Id.* at 26 (quotations omitted).

### iv. Analysis of evidence

#### 1) Total disability and 15-year presumption

Based on the evidence described above, the ALJ found that Mr. Kourianos was totally disabled. The ALJ noted that the "pulmonary function tests and the arterial blood gas studies yield equivocal results." *Id.* at 24. Regarding the medical opinions, he stated as follows:

> I find that the medical opinion evidence does establish that
> Claimant is totally disabled from working as a fire boss. I
> give great weight to Dr. Gagon's opinion, because he is the
> only physician who discussed (in his deposition) the specific
> duties Claimant performed as a fire boss. His opinion
> regarding disability is well-documented and well-reasoned,
> and he was in a better position to determine whether Claimant

25

could exert the physical effort required to perform a fire boss's duties than the other physicians. *See Killman v. Director, OWCP*, 415 F.3d 716, 722 (7th Cir. 2005).

I give little weight to Dr. Zaldivar's and Dr. Selby's findings that Mr. Kourianos is not disabled. Neither doctor's finding was informed by details of Claimant's usual coal mine employment. Furthermore, Dr. Zaldivar and Dr. Selby both stated in their reports and testified at their depositions that the arterial blood gas studies did not properly account for Price, Utah's altitude: because the test was conducted at a relatively high altitude, they stated, and because PO2 values could be expected to drop linearly as altitude increased, the low PO2 value should not be considered to show disability. Appendix C to 20 C.F.R. Part 718, however, requires that administrative law judges analyze arterial blood gas studies according to three ranges of altitude: from sea level to 2,999 above sea level; from 3,000 to 5,999 above sea level; and over 6,000 feet above sea level. The testing was performed in the second range, from 3,000 to 5,999 feet above sea level. The regulations do not contemplate further dividing testing results into narrower ranges, nor am I permitted to do so. Because Dr. Zaldivar's and Dr. Selby's statements are inconsistent with the regulations, I give their opinions regarding Claimant's disability little weight.

*Id.* at 24. Thus, he found that Mr. Kourianos had met element three of a BLBA claim—the disability element. Because he found that Mr. Kourianos was totally disabled and had worked as a miner for more than 15 years, the ALJ applied the 15-year presumption.

2) No rebuttal of presumption

Element One—the ALJ initially found that Hidden Splendor had rebutted the presumption of clinical pneumoconiosis because Mr. Kourianos did not submit evidence of clinical pneumoconiosis. But based on Dr. Gagon's diagnosis of chronic bronchitis that was caused in part by coal dust, the ALJ concluded that Hidden Splendor could not

26

rebut the presumption that Mr. Kourianos suffered from legal pneumoconiosis (the disease element).

Although Mr. Kourianos had a history of smoking, the ALJ found that none of the doctors established a sufficiently precise connection between smoking and Mr. Kourianos's respiratory problems. Specifically, the ALJ gave "little weight to Dr. Gagon's conclusion that coal dust exposure and cigarette smoke equally contributed to his respiratory condition, because his diagnosis is conclusory and not well documented." *Id.* at 26. The ALJ also "g[a]ve little weight to Dr. Zaldivar's conclusion that Claimant's respiratory condition was caused solely by smoking" because (1) Dr. Zaldivar implied that "blood gas studies alone could not indicate the presence of coal workers' pneumoconiosis, but that pneumoconiosis *must* be seen via pulmonary function testing or x-rays—a position inconsistent with the regulations"; and (2) his conclusions about smoking were "based on an analysis of the general population, and not on an analysis specific to the miner." *Id.* Finally, the ALJ gave "little weight to Dr. Selby's finding that Mr. Kourianos suffered from asthma and that his asthma was unrelated to his coal mining and exacerbated by his smoking" for two reasons: (1) Dr. Selby was the only doctor to diagnose Mr. Kourianos with asthma, and he did not adequately document or explain his diagnosis; and (2) "Dr. Selby's statement that 'working in coal mines prohibits the inhalation of cigarette smoking, thus actually protecting the lungs' is contrary to the central purpose and function of the [BLBA]." *Id.*

27

Element Two—because Hidden Splendor argued only that Mr. Kourianos did not have pneumoconiosis (disease) and did not dispute that coal mining caused his pneumoconiosis (disease causation), the ALJ found that it had not rebutted the presumption of disease causation. In doing so, the ALJ acknowledged the 10-year presumption,[8] noting that the BLBA "regulations provide for a rebuttable presumption that pneumoconiosis arose out of coal mine employment if a miner with pneumoconiosis was employed in the mines for ten or more years." *Id.* at 27 (citing 30 U.S.C. § 921(c)(1); 20 C.F.R. § 718.203(b)).

Element Four[9]—the ALJ found that Hidden Splendor had not rebutted the presumption that pneumoconiosis caused Mr. Kourianos's disabling respiratory or pulmonary impairment (disability causation). *Id.* at 27. The ALJ reasoned, "[N]either Dr. Zaldivar nor Dr. Selby diagnosed pneumoconiosis, and Employer has pointed to no other evidence to rebut the presumption that Mr. Kourianos's pneumoconiosis caused his total disability." *Id.* In other words, because Hidden Splendor's arguments challenged only the existence of a total disability (disability), it did not argue against the disability causation presumption in the alternative.

---

[8] As noted above, a claimant who has established the 15-year presumption does not need the benefit of the 10-year presumption.

[9] As noted above, the ALJ found that element three—total disability—had been satisfied. Together with Mr. Kourianos's 27 years as a coal miner, this established the 15-year presumption, prompting the need for Hidden Splendor to rebut elements one, two, or four.

Finding that Mr. Kourianos had satisfied the four elements of a BLBA claim, the ALJ awarded Mr. Kourianos benefits and found Hidden Splendor liable for those benefits as the responsible operator.

## 3. **Proceedings before the BRB**

Hidden Splendor appealed to the BRB, arguing the ALJ erred in finding that (1) Hidden Splendor was the responsible operator; (2) the evidence established total disability under 20 C.F.R. § 718.204(b)(2); (3) Mr. Kourianos was entitled to the 15-year presumption; and (4) Hidden Splendor did not rebut the presumption. *Id.* at 30-31.

In deciding the appeal, the BRB first recited the standard of review, explaining that the ALJ's Decision and Order "must be affirmed if it is rational, supported by substantial evidence, and in accordance with applicable law." *Id.* at 32 (citing 33 U.S.C. § 921(b)(3), as incorporated by 30 U.S.C. § 932(a)). It unanimously affirmed on all grounds.[10]

---

[10] One member of the panel concurred in the judgment, highlighting that the ALJ did not rely solely on Appendix C of the regulations in making his determination: "Given that he accurately characterized their opinions and provided a rational basis for rejecting them, his additional statement that he was not 'permitted' to consider further altitude adjustments was, at worst, a harmless error, in my view." Suppl. App. at 44.

## III. **DISCUSSION**

Rockwood raises two issues on appeal.[11] First, did the ALJ err in denying Hidden Splendor's motion to withdraw its responsible operator stipulation? Second, did substantial evidence support the ALJ's determination that Mr. Kourianos is entitled to benefits?

This case has three parties. Rockwood is the petitioner acting as Hidden Splendor's legal representative and agent. Mr. Kourianos and the Director are both respondents. Mr. Kourianos defends both issues on appeal but requests that if "Employer is not the properly named responsible operator," this court should name the Black Lung Trust Fund as liable for his benefits. Kourianos Br. at 11. To defend the interests of the Trust Fund, the Director disputes only the responsible operator issue and takes no position on Mr. Kourianos's eligibility for benefits.

### A. *Standard of Review*

On the first appeal issue—the ALJ's denial of Rockwood's motion to withdraw its responsible operator stipulation—the parties state that our standard of review is abuse of discretion. *See* Pet'r's Br. at 5-6; OWCP's Br. at 20; Kourianos's Br. at 9. But as our

---

[11] Rockwood also filed a contested motion to supplement the record with an agreed order between the Director and Consolidated Coal in a separate case. The agreed order was not before the ALJ in this case and we therefore deny Rockwood's motion to supplement the record. *See In re United States*, 138 S. Ct. 371, 372 (2017) (explaining that the administrative record consists of materials relied upon and considered by agency decision makers).

30

discussion of this issue shows, Rockwood's argument appears to challenge not only the

ALJ's application of the regulations but also his interpretation of them. Courts review

the latter de novo but grant deference to the agency's interpretation of its own

regulations. *See Antelope Coal*, 743 F.3d at 1341; *Andersen*, 455 F.3d at 1103. We need

not analyze the standard of review further because, under either abuse of discretion or de

novo review, we affirm the ALJ's decision on this issue.

On the second appeal issue—the ALJ's benefits determination—we review

whether "substantial evidence" supported the ALJ's decision. *Hansen v. Dir., OWCP*,

984 F.2d 364, 368 (10th Cir. 1993). Substantial evidence is "such relevant evidence as a

reasonable mind might accept as adequate to support a conclusion." *Consol. Edison Co.*

*v. NLRB*, 305 U.S. 197, 229 (1938); *see Energy W. Mining Co. v. Oliver*, 555 F.3d 1211,

1217 (10th Cir. 2009). We do not reweigh the evidence presented to the ALJ. *Antelope*

*Coal*, 743 F.3d at 1341. "[W]here medical professionals . . . disagree[ ], the trier of fact

is in a unique position to determine credibility and weigh the evidence." *Id.* (quotations

omitted). Thus, "the task of weighing conflicting medical evidence is within the sole

province of the ALJ." *Hansen*, 984 F.2d at 368.[12]

---

[12] Although we formally review the BRB's decision, the BRB's deferential
standard of review of ALJ decisions requires us to examine the ALJ's findings of fact.
*Antelope Coal*, 743 F.3d at 1341 n.13; *Blackburn*, 857 F.3d at 822; *see also* 33 U.S.C.
§ 921(b)(3) (stating that on review by the BRB, the ALJ's findings of fact are "conclusive
if supported by substantial evidence").

## B. *The Responsible Operator Determination*

The ALJ did not determine whether Mr. Kourianos worked as a miner at Hidden Splendor for a full year. Rather, Hidden Splendor admitted to the Director that it was the responsible operator, and the ALJ accepted that admission as conclusive. Rockwood therefore challenges the ALJ's refusal to allow Hidden Splendor to withdraw its stipulation.

### 1. **Additional Legal Background**

The Department of Labor's regulations prescribe the process for determining the responsible operator. They generally call for the district director—not the ALJ—to decide the responsible operator question. *See* 20 C.F.R. § 725.418(d) (providing that the district director must "dismiss, as parties to the claim, all other potentially liable operators" when it issues its PDO); *id.* § 725.407(d) (prohibiting the district director from "notify[ing] additional operators of their potential liability after a case has been referred" to an ALJ). The Department of Labor explained the rationale for this rule when it promulgated updated BLBA regulations in 2010:

> The Department agrees that the revised regulations place additional burdens on coal mine operators who have, in the past, routinely filed form controversions of their liability for benefits and waited until the case was referred to the Office of Administrative Law Judges to develop their defenses. . . . As revised, the regulations will permit the district director to refer a case to the Office of Administrative Law Judges with no more than one operator as a party to the claim, the responsible operator as finally designated by the district director. The regulations prohibit the remand of cases for the identification of additional potentially liable operators, or to

32

allow the district director to designate a new responsible operator, thereby reducing delay in the adjudication of the merits of a claimant's entitlement. This change also places the risk that the district director has not named the proper operator on the Black Lung Disability Trust Fund, however. The Department believes that the additional demands placed upon potentially liable operators are not unreasonable. In addition, the Department does not accept the criticism that the regulation sets traps for unwary litigants. The nature of the evidence required by the Department, and the time limits for submitting that evidence, are clearly set forth in the regulations, and will be communicated to potentially liable operators who are notified of a claim by the district director.

Regulations Implementing the Federal Coal Mine Health and Safety Act of 1969, as Amended, 65 Fed. Reg. 79920-01, 79985 (Dec. 20, 2000) (citations omitted).

Accordingly, even if the district director incorrectly identifies the responsible operator and refers the case to an ALJ, a new responsible operator may not be named. *Appleton & Ratliff Coal Corp. v. Ratliff*, 664 F. App'x 470, 473 (6th Cir. 2016) (unpublished) ("The appeal to an ALJ is the point of no return on the responsible operator designation."). "If subsequent proceedings determine the director's designation is not supported, the matter is not remanded to find a different responsible operator and, instead, the Trust Fund pays benefits." *Id.*

Against this backdrop, we apply the general rule that "stipulations and concessions bind those who make them." *Consolidation Coal Co. v. Dir., OWCP* ("*Burris*"), 732 F.3d 723, 730 (7th Cir. 2013). In this case, the potential exception to that rule is 20 C.F.R. § 725.463(b), which provides that "[a]n administrative law judge may consider a new issue only if such issue was not reasonably ascertainable by the parties at the time

33

the claim was before the district director." *See also Marfork Coal Co. v. Weis*, 251 F. App'x 229, 236 (4th Cir. 2007) (denying operator's motion to belatedly introduce x-ray evidence because the x-ray was not previously hidden; it "was waiting to be found").

2. **Analysis**

Hidden Splendor conceded its responsible operator status (1) in its amended response to the district director's notice of claim, in which it stated that it was "the responsible operator within the meaning of the [BLBA]," Suppl. App. at 58; (2) in its response to the district director's SSAE, in which it stated that "Hidden Splendor has accepted the designation of Responsible Operator," *id.* at 73; and (3) in its initial submission to the ALJ, in which it stated that Hidden Splendor "does *not* dispute its designation as the Responsible Operator," *id.* at 83.

As the ALJ noted, Hidden Splendor's senior staff accountant had reported in a fax to the district director that Mr. Kourianos worked "outside at the loadout"—not "in the mine"—during his last months at Hidden Splendor. *Id.* at 46. But notwithstanding the fax's suggestion that Mr. Kourianos was not "in the mine" for a full year at Hidden Splendor, Rockwood failed to investigate Mr. Kourianos's employment and did not dispute the responsible operator question until the ALJ's hearing more than two years after Mr. Kourianos filed his claim. These facts undercut any argument that responsible operator evidence was not "reasonably ascertainable" while Mr. Kourianos's claim was pending before the district director. 20 C.F.R. § 725.463(b).

34

Hidden Splendor could have "reasonably ascertain[ed]" Mr. Kourianos's job duties in a number of ways. *See id.* As the BRB noted, Hidden Splendor "determined the terms of claimant's work and therefore normally would have records relevant to the nature of his employment (job title, etc.). Employer has not averred that it had no records or access to relevant personnel with the requisite information." Suppl. App. at 34 n.5. In addition, neither Hidden Splendor nor Rockwood has suggested that they sought to speak to Mr. Kourianos or his co-workers about his duties at Hidden Splendor. Moreover, if Hidden Splendor had checked its operating records, it would have found its mine was closed for part of the time that Mr. Kourianos worked there. Any of these steps would have been reasonable, but Rockwood did not take them. Mr. Kourianos's employment was not only "reasonably ascertainable" but was easily ascertainable through a simple phone call or a review of Hidden Splendor's records. 20 C.F.R. § 725.463(b).

Rockwood's excuses for Hidden Splendor's failure to investigate are not convincing. Rockwood appears to argue that the regulations' timeline prevented it from submitting new evidence after 90 days of receiving the district director's notice of claim. *See* Pet'r's Br. at 18. The regulations show otherwise. *See* 20 C.F.R. § 725.417(b) ("In appropriate cases, the district director may permit a reasonable time for the submission of additional evidence following a conference . . . ."); *id.* § 725.410(b) ("The [SSAE] shall allow *all parties* not less than 60 days within which to submit additional evidence, including evidence relevant to the claimant's eligibility for benefits and evidence *relevant to the liability of the designated responsible operator*." (emphasis added)). In addition,

35

Hidden Splendor did not ask to submit additional evidence or suggest that it wanted to challenge its responsible operator status before the district director.

Rockwood also suggests that the available documentary evidence about Mr. Kourianos's employment was misleading. It was not. Mr. Kourianos's Social Security earnings statement showed that he was a Hidden Splendor employee and stated how much money he made working for the company, but it said nothing about his job duties. In addition, the accountant's "Hire Dates for Tony Kourianos" fax showed that Mr. Kourianos did not work "in the mine" for at least part of his time with the company. Suppl. App. at 46.

Finally, Rockwood's reliance on *Morrison v. Hurst Drilling Co.*, 512 P.2d 438, 439-40 (Kan. 1973) is misplaced. In *Morrison*, an employee's wife filled out her husband's workers' compensation claim and erroneously listed the place of injury as Kansas. *Id.* at 440-41. Relying on the employee's wife's statement, the defendant employer stipulated that the injury occurred in Kansas. *Id.* at 440. After the employee's testimony and other documentation revealed the injury had occurred at a work site in Oklahoma (a finding that deprived the Kansas court of jurisdiction), the employer sought to withdraw its stipulation. *Id.* The claim examiner granted the employer's motion.

On appeal, the Kansas Supreme Court recited the applicable rule as follows:

> The general rule is that a stipulation having all the binding force of a contract cannot be set aside on grounds other than those justifying the setting aside of contracts generally, such, for instance, as fraud, collusion, mistake, accident, surprise, undue influence, false representations innocently made,

36

> inadvertence or improvidence in making the stipulation, or some other ground of the same nature.

*Id.* at 441 (quotations omitted). Applying that rule, the court then held that the defendant relied on the employee's wife's misstatement when it entered the stipulation, noted that the plaintiff would not suffer any prejudice from an order withdrawing the stipulation because he could simply re-file his workers compensation claim in Oklahoma, and allowed the defendant to withdraw its stipulation. *Id.* at 442.

Unlike the employee in *Morrison*, 512 P.2d at 440, whose wife misstated a material fact in the workers' compensation claim, Mr. Kourianos never suggested that he was a coal miner the entire time he worked at Hidden Splendor. To the contrary, he stated at the hearing that he "kn[e]w by law that we have to blame [Hidden Splendor]" for his disability, but he explained forthrightly that he did not do "miner" work for a full year with the company. ALJ Hrg. Tr. at 35, 56-62.

In addition, Rockwood's discussion of *Morrison* is misguided because Mr. Kourianos's claim involved the application of the BLBA regulations rather than state common law. As discussed above, the regulations place the burden on employers to challenge their responsible operator designation before the district director. *See Ratliff*, 664 F. App'x at 473. If they fail to do so and the ALJ ultimately finds they were wrongly named as the responsible operator, that decision does not shift liability to another operator. *Id.* Instead, the Black Lung Trust Fund must step in to replace the operator as the party liable for paying the miner's benefits. *See* 26 U.S.C. § 9501(d)(1). Under this

37

statutory scheme, the Department of Labor has declared—through its regulations—that the district director should resolve responsible operator issues in the first instance, *see* 20 C.F.R. § 725.407(d), and the ALJ properly applied the Department's regulations, *see* Suppl. App. at 2-3.

*　　*　　*　　*

In sum, the nature of Mr. Kourianos's employment at Hidden Splendor was "reasonably ascertainable" the entire time his claim was pending before the district director. *See* 20 C.F.R. § 725.463(b). With due diligence, Hidden Splendor could have obtained all the necessary information about Mr. Kourianos's work responsibilities before the claim ever reached the ALJ. Because it failed to do so, the ALJ did not err in denying Hidden Splendor's motion to withdraw its responsible operator stipulation.[13]

### C. *The Benefits Eligibility Determination*

The ALJ's benefits eligibility determination rests on factual findings. We uphold those findings when substantial evidence supports them. *See Antelope Coal*, 743 F.3d at 1341.

---

[13] We decline to address the Director's argument that responsible operator liability can never be raised as a "new issue" in the ALJ hearing when the operator has conceded liability before the district director. *See* OWCP Br. at 25-26. We hold only that, in this case, the ALJ properly denied Rockwood's motion to re-open the issue under the "new issue" rule. 20 C.F.R. § 725.463(b).

1. **BLBA Claims Framework**

As previously discussed, to prevail on a BLBA benefits claim, the claimant must establish four elements:

> (1)    the claimant suffers from pneumoconiosis (disease),
>
> 2)    the claimant's pneumoconiosis arose out of coal mine employment (disease causation),
>
> (3)    the claimant is totally disabled because of a respiratory or pulmonary impairment (disability), and
>
> (4)    claimant's pneumoconiosis is a substantially contributing cause of the miner's total disability (disability causation).

*Blackburn*, 857 F.3d at 821.

Mr. Kourianos worked as a miner for more than 27 years. To invoke the 15-year presumption, therefore, he needs to show only that he suffered from a totally disabling respiratory or pulmonary impairment. 20 C.F.R. §§ 718.204, 718.305(b)(1); *see Antelope Coal*, 743 F.3d at 1344. And once he has done so, the other three elements of a BLBA claim are presumptively established. The presumption therefore "softens [Mr. Kourianos's] burden" and places a heavier burden on Rockwood. *Blackburn*, 857 F.3d at 822. On appeal, Rockwood primarily seeks to avoid the application of the 15-year presumption by arguing the ALJ incorrectly determined that Mr. Kourianos was totally disabled due to a respiratory or pulmonary impairment.

The following analysis concludes that substantial evidence supported the ALJ's determination that the 15-year presumption applied to Mr. Kourianos's claim. We further

39

conclude that Hidden Splendor did not rebut the presumption by disproving that

(1) pneumoconiosis caused Mr. Kourianos's pulmonary impairment or that (2) Mr.

Kourianos's pneumoconiosis caused his total disability.

2. **Analysis**

   a. *Total disability*

As noted above, the ALJ relied on two types of evidence in reaching his total

disability determination.  First, he considered arterial blood gas studies under 20 C.F.R.

§ 718.204(b)(2)(ii).  Second, finding the studies "equivocal," he considered the medical

opinions discussed above.  *Id.* § 718.204(b)(2)(iv).

      i. Arterial blood gas testing

Mr. Kourianos's 2012 arterial blood gas test yielded a $PCO_2$ level of 33 and a $PO_2$

level of 59 during exercise, thus bringing him below the impairment threshold $PO_2$ level

of 62 on the Appendix C chart.  All three doctors, however, including Dr. Gagon, stated

that Mr. Kourianos's $PO_2$ value of 59 at Price, Utah, was "normal."  *See* EX 12 at 11-12;

Suppl. App. at 38.  This view stemmed from the altitude of Price, Utah, falling in the

upper end of the 3,000-5,999-foot range and the fact that "normal $PO_2$ levels are

expected to drop linearly as altitude increases."  Suppl. App. at 38.  Accordingly,

Rockwood argues that the blood gas studies did not provide evidence of Mr. Kourianos's

disability and could not support the ALJ's finding that the medical tests were

"equivocal."  Pet'r's Br. at 28.  We disagree.

40

First, Mr. Kourianos's 2012 arterial blood gas testing yielded a PO2 level that qualified him for impairment under the regulations. *See Erie Boulevard Hydropower, LP v. FERC*, 878 F.3d 258, 269 (D.C. Cir. 2017) ("It is axiomatic that an agency is bound by its own regulations." (quotations and alterations omitted)). As Dr. Gagon stated in his supplemental report, "I cannot change the 'rules of the game.' Based on the table set forth [in Appendix C], [Mr. Kourianos] meets the requirements of disability based on his hypoxemia at the altitude range of 3000-5999." Doc. 10612740 at 8. Irrespective of how altitude may affect test results within a range, Appendix C still qualified Mr. Kourianos for a pulmonary or respiratory impairment. The ALJ therefore properly considered Appendix C—as well as the medical opinions—in making his ultimate disability determination. *See Bosco v. Twin Pines Coal Co.*, 892 F.2d 1473, 1479 (10th Cir. 1989) (declaring that "an ALJ must consider all evidence relevant to the issue of total disability" in deciding whether 15-year presumption applies).

Second, Dr. Gagon testified that "it was abnormal that the PO2s dropped" with exercise, and neither of the other doctors contested his conclusion. EX 12 at 11-12; *see* EX 5 at 10-11; EX 2 at 8-9.[14] Accordingly, even if the PO2 levels were "normal" for

[14] In this respect, Rockwood misconstrues the record when it states that "all of Mr. Kourianos'[s] testing values were normal." Pet'r's Br. at 45. Mr. Kourianos's arterial blood gas testing was abnormal under the regulations, and the drop in his PO2 values from resting to exercise was also "abnormal." Suppl. App. at 37-38 & n.13.

Price, Utah, the test still revealed a notable abnormality that suggested some degree of respiratory impairment.

### ii. Medical opinions

The ALJ appeared to rely in part on the arterial blood gas studies for his total disability decision, but because he also found them to be "equivocal," and not sufficient to find total disability on their own, he relied further on the three doctors' medical opinions for his ultimate disability determination. Suppl. App. at 24; *see* 20 C.F.R. § 718.204(b)(2)(iv). As we discuss below, substantial evidence supported the ALJ's evaluation of the medical opinions. *See Hansen*, 984 F.2d at 368 ("[T]he task of weighing conflicting medical evidence is within the sole province of the ALJ.").

All three doctors found that Mr. Kourianos had respiratory problems, which qualified his impairment as legal pneumoconiosis to the extent they were "chronic." *See Antelope Coal*, 743 F.3d at 1335; 20 C.F.R. § 718.201(a)(2) (legal pneumoconiosis includes "any chronic restrictive or obstructive pulmonary disease arising out of coal mine employment" (quotations omitted)). Dr. Gagon diagnosed Mr. Kourianos with chronic bronchitis, a chronic productive cough, and a significant drop in PO2 levels with exercise. Suppl. App. at 18. Dr. Zaldivar noted that Mr. Kourianos showed "symptoms of chronic bronchitis for one-and-a-half years and night wheezing" and explained that his "[l]ungs showed decreased breath sounds." *Id.* at 19 (quotations omitted). Dr. Selby noted that Mr. Kourianos's symptoms of "wheezing, productive cough, and decreased PO2, indicated a very strong presentation for the diagnosis of asthma." *Id.* at 21

42

(quotations omitted).  The doctors therefore disagreed about the severity rather than the existence of Mr. Kourianos's impairment.

The ALJ compared Mr. Kourianos's disability to his job duties, as 20 C.F.R. § 718.204(b)(1) required.  Weighing the evidence, he gave greater weight to Dr. Gagon's testimony because "he [was] the only physician who discussed (in his deposition) the specific duties Claimant performed as a fire boss."  Suppl. App. at 24.  He discounted Dr. Zaldivar's and Dr. Selby's findings that Mr. Kourianos was not disabled because their opinions were not "informed by details of Claimant's usual coal mine employment."  *Id.* We do not reweigh evidence, and the ALJ considered all the evidence before him and explained his conclusion fully.  *See Blackburn*, 857 F.3d at 826-28 (upholding BRB decision when ALJ credited one doctor's causation testimony against the testimony of two other doctors); *see also Hansen*, 984 F.2d at 368 (noting that the ALJ is in a unique position to judge the credibility of medical professionals).  The total disability determination was supported by substantial evidence.  *See* 33 U.S.C. § 921(b)(3).

b.  *Rockwood has not overcome the 15-year presumption*

Because substantial evidence supported the ALJ's total disability determination— the third element of a BLBA claim—the 15-year presumption provided that the disease, disease causation, and disability causation elements were presumptively met.  The burden thus shifted to Rockwood to disprove any of those elements.  We conclude it failed to do so.

43

i. No rebuttal of presumption of pneumoconiosis or disease causation

Because substantial evidence supported the ALJ's determination that Mr. Kourianos was totally disabled and because Mr. Kourianos worked for more than 27 years as a coal miner, the ALJ was required to presume that he had legal pneumoconiosis caused by his coal mine work.

Rockwood attempts to rebut the presumptions that Mr. Kourianos suffered from pneumoconiosis and that it arose from coal mining by pointing to Mr. Kourianos's history of smoking as an alternative cause of his impairment. All three doctors suggested that smoking contributed, at least in part, to Mr. Kourianos's respiratory problems. Suppl. App. at 26. But the ALJ gave limited weight to their opinions because they all spoke about the general dangers of smoking without linking smoking to any of Mr. Kourianos's particular problems.

The ALJ noted that Dr. Gagon's opinion that smoking and coal dust were equal contributors to Mr. Kourianos's problems was "conclusory and not well-documented." *Id.* The ALJ discredited Dr. Zaldivar's causation opinion because it was "based on an analysis of the general population, and not on an analysis specific to the miner." *See id.* at 26. And he discredited Dr. Selby's opinion, in part because his "statement that 'working in the coal mines prohibits the inhalation of cigarette smoking, thus actually protecting the lungs' [was] contrary to the central purpose and function of the act." *Id.* (quoting Dr. Selby Depo.). The ALJ did not find this reasoning convincing, and we do not disturb that determination when it is based on reasoned judgment. *See Antelope Coal*,

44

743 F.3d at 1345-46 (upholding ALJ's rejection of an operator's reliance on statistical data to prove the effects of smoking on a coal miner); *see also Blackburn*, 857 F.3d at 826-28 (upholding ALJ's determination that employer did not rebut presumption of pneumoconiosis when doctors provided inconsistent testimony about smoking).

The 15-year presumption shifts the burden to the employer, who must present evidence to rebut the existence of or the causation of pneumoconiosis. The ALJ concluded Hidden Splendor did not rebut these presumptions. We find that substantial evidence supported that decision. *See* 20 C.F.R. § 718.305(d) ("The presumption must not be considered rebutted on the basis of evidence demonstrating the existence of a totally disabling obstructive respiratory or pulmonary disease of unknown origin.").

### ii. No rebuttal of presumption of total disability due to pneumoconiosis

Rockwood also argues that Mr. Kourianos's disability cannot be attributed to pneumoconiosis, but it relies on the same arguments it uses to challenge that Mr. Kourianos is totally disabled. We have rejected these arguments. Moreover, Rockwood does not point to evidence of any other ailment—e.g., lung cancer from cigarettes—that might have caused Mr. Kourianos's total disability. As the ALJ noted, "Employer has pointed to no other evidence to rebut the presumption that Mr. Kourianos's pneumoconiosis caused his total disability." Suppl. App. at 27. We find that substantial evidence supports this determination.

45

* * * *

In sum, the ALJ properly found that the 15-year presumption applied because Mr. Kourianos was (1) totally disabled as a result of a respiratory impairment and (2) worked for more than 15 years in a mine. *See Antelope Coal*, 743 F.3d at 1335. The burden thus fell on Rockwood to rebut the presumptions that Mr. Kourianos had pneumoconiosis, that coal mining caused it, and that his pneumoconiosis caused his total disability. *See id.* at 1336. The ALJ concluded that it had not done so, and we find that substantial evidence supports that conclusion.

## III. **CONCLUSION**

Because the ALJ did not err in denying Hidden Splendor's motion to withdraw its responsible operator stipulation, and because the ALJ's substantive benefits determination was well reasoned and supported by substantial evidence, we deny Rockwood's petition.