**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

───────────

**No. 23-2157**

───────────

HOBET MINING, INCORPORATED; ARCH RESOURCES,

Petitioners,

v.

DIRECTOR, OFFICE OF WORKERS' COMPENSATION PROGRAMS, UNITED STATES DEPARTMENT OF LABOR; HORACE K. MEREDITH, JR.,

Respondents.

───────────

On Petition for Review of an Order of the Benefits Review Board, United States Department of Labor.  (23−0093 BLA)

───────────

Argued:  March 18, 2025                    Decided:  October 1, 2025

───────────

Before KING, AGEE, and QUATTLEBAUM, Circuit Judges.

───────────

Petition granted; board decision vacated and remanded by published opinion.  Judge Quattlebaum wrote the opinion in which Judge Agee joined. Judge King wrote a dissenting opinion.

───────────

**ARGUED:** Dominic Emil Draye, GREENBERG TRAURIG, LLP, Phoenix, Arizona, for Petitioners.  Brad Anthony Austin, WOLFE, WILLIAMS & AUSTIN, Norton, Virginia; Sean Gregory Bajkowski, UNITED STATES DEPARTMENT OF LABOR, Washington, D.C., for Respondents.  **ON BRIEF:** Michael A. Pusateri, Mark E. Solomons, GREENBERG TRAURIG, LLP, Washington, D.C., for Petitioners.  Seema Nanda, Solicitor of Labor, Barry H. Joyner, Associate Solicitor, Jennifer Feldman Jones, Deputy Associate Solicitor, Kathleen H. Kim, Office of the Solicitor, UNITED STATES

DEPARTMENT OF LABOR, Washington, D.C., for Federal Respondent.

QUATTLEBAUM, Circuit Judge:

For a time, Arch Coal Company, Inc. was the parent company of Hobet Mining, Inc. and several other subsidiary companies that operated coal mines. Arch covered its own liabilities under the Black Lung Benefits Act for coal miners' benefits claims and those of its subsidiaries—including Hobet—through a self-insurer indemnity bond. Later, Arch sold Hobet and two other subsidiaries to Magnum Coal. Arch notified the Department of Labor—which regulates black lung benefits claims—of its sale of Hobet and the other two subsidiaries to Magnum. Arch stated that, going forward, Magnum would be responsible for all of Hobet's and the other two subsidiaries' black lung liabilities. Magnum then transferred those mines to Patriot Coal Company. The Department approved Patriot as a self-insurer for Hobet and the two other subsidiaries; in fact, its approval was retroactive to before the time Patriot owned the subsidiaries and included the time Arch owned them. And when miners—even those who last worked for the subsidiaries when Arch owned them—filed black lung claims, the Department named Patriot, not Arch, as responsible for paying the benefits.

Things changed, however, after Patriot went bankrupt and Hobet went out of business. With those companies no longer able to pay black lung benefits claims, the Department began seeking to hold Arch liable for claims filed long after it ceased to be the parent company of Hobet and the other two subsidiaries and long after it ceased covering those coal mine operations with its self-insurance bond. This appeal involves one of those claims.

3

After working as a coal miner for decades, Horace Meredith's last job as a miner was with Hobet. During the time Meredith worked there, Arch was Hobet's parent company and covered its black lung liabilities. Over 20 years after he last worked at Hobet, and years after Arch had sold Hobet, Meredith filed a black lung benefits claim. Ultimately, an Administrative Law Judge found that because Meredith had worked for Hobet on his last day as a miner, Hobet was the operator responsible for Meredith's black lung benefits. And she found that Arch was liable for paying Meredith benefits because it owned and provided self-insurance to Hobet on the last day of his coal mining employment. The Department's Benefits Review Board affirmed the ALJ, holding that "Hobet and Arch are the responsible operator and carrier, respectively, and are liable for [the] claim." J.A. 658.

Those decisions, however, misconstrue the Act and its regulations. Neither the Act nor the regulations impose liability on Arch under these circumstances. To the delight of some and the chagrin of others, modern administrative agencies possess substantial power. But that power does not include the ability to declare liability just because the agency says so. The Board erred in affirming the ALJ and concluding that Hobet was the responsible operator and Arch was liable to pay as its carrier. Accordingly, we grant the petition for review, vacate the decision of the Board and remand for further proceedings consistent with this opinion.

## I.    Black Lung Benefits Act Claims

Before getting into the facts of this case, some legal background will be helpful. Try to stay awake. It's tedious but needed to understand our analysis.

4

## A. Black Lung Benefits Act Claims Procedures

We begin with the procedures for Black Lung Benefits Act claims. The Act and its regulations provide a framework for awarding benefits to miners disabled from lung disease caused by working in and around coal mines. *See* 30 U.S.C. §§ 901–944; 20 C.F.R. § 718.201. They assign financial responsibility for a miner's black lung benefits to a coal mine operator where the disease developed, whenever possible. *See* 30 U.S.C. § 932(c); 20 C.F.R. § 725.495(a)(1). If there is no operator who is liable for the payment of such benefits, the Black Lung Disability Trust Fund covers the costs. *See* 26 U.S.C. § 9501(d)(1)(B).

To obtain benefits, the miner files a claim with the Department of Labor. That triggers the Act's "adversarial administrative procedure." *Island Creek Coal Co. v. Blankenship*, 123 F.4th 684, 688 (4th Cir. 2024). In that process, the miner must prove that he is disabled due to a coal dust-related pulmonary or respiratory condition arising out of coal mine employment. *Id.*

These claims may be reviewed in several stages. First, the claim is processed by "district directors" in local offices throughout the country. The district director, or a claims examiner on his behalf, investigates and adjudicates those claims.[1] 20 C.F.R. § 725.350. Second, if a party appeals that decision to the Office of Administrative Law Judges and

---

[1] Importantly, in addition to the district director, the regulations also identify the Director of the Department's Office of Workers' Compensation, who we will distinguish by referring to as the "Director." He is charged with administering the Act, is a party to all benefits adjudications and may participate in all stages of claim adjudication. *See* 30 U.S.C. § 932(k); 20 C.F.R. § 725.482(b).

requests a formal hearing, an ALJ can then review the district director's decision. 20 C.F.R. § 725.450–51. Third, the ALJ's determination may then be reviewed by the Benefits Review Board. 20 C.F.R. § 725.481. And finally, Board decisions may be reviewed by petitioning the United States Court of Appeals for the circuit in which the injury occurred. 33 U.S.C. § 921(c).

At the first stage, district directors accept evidence to determine whether the claimant is eligible for benefits and who must pay those benefits. As for eligibility, the district director reviews employment and medical records to determine if the miner is disabled and if any disability is at least in part from working in or around a coal mine. 20 C.F.R. § 725.405. The district director must also determine whether any of the miner's previous employers may be held liable for the payment of benefits as a "responsible operator."[2] 20 C.F.R. § 725.407(a).

But just who is the "responsible operator" is not necessarily a straightforward inquiry. That's because often, over the course of their careers, miners end up working for several operators. Determining who is the "responsible operator" requires the district director to first determine all of the "potentially liable operators." In the simplest case, the "responsible operator" is the miner's most recent employer, if that employer satisfies the requirements of a "potentially liable operator." 20 C.F.R. § 725.495(a)(1). To qualify as a "potentially liable operator," the operator must have employed the miner for at least one

---

[2] An "operator" means "any owner, lessee, or other person who operates, controls or supervises a coal mine, including a prior or successor operator . . . and certain transportation and construction employers." 20 C.F.R. § 725.101(a)(23).

year; the miner's disability or death must have arisen at least in part out of employment in or around a mine during the time when the mine was operated by the operator; and the operator must be "capable of assuming its liability for the payment of continuing benefits" through obtaining a commercial policy or insurance contract, qualifying as a self-insurer or having sufficient assets to secure the payment of benefits if a claim is awarded.[3] 20 C.F.R. § 725.494. Only the financial capability to pay benefits matters in this appeal. 20 C.F.R. § 725.494(e).[4]

The district director notifies each of the potentially liable operators of the claim. 20 C.F.R. § 725.407(b). If the Department's records indicate that the operator "had obtained a policy of insurance, and the claim falls within such policy," the "operator's carrier" is also notified. *Id.*[5] Any operator or carrier notified of the claim is considered a party to the

---

[3] There are also two timing requirements. The operator must be an operator after June 30, 1973, and the miner's employment must arise after December 31, 1969. 20 C.F.R. § 725.494(b), (d).

[4] The regulations are a bit confusing as to the sequence and burden of proving financial capability. The district director investigates and ultimately decides whether any operator qualifies as a responsible operator. 20 C.F.R. § 725.407(a). Then, the Director bears the burden of proving the responsible operator initially designated by the district director as liable for paying benefits meets the potentially liable operator criteria. 20 C.F.R. § 725.495(b). At this point, absent evidence to the contrary, the regulations establish a presumption that the designated operator is financially capable of paying benefits. *Id*. Thus, the burden then shifts to the responsible operator to prove that "it does not possess sufficient assets to secure the payment of benefits" or that "it is not the potentially liable operator that most recently employed the miner." 20 C.F.R. § 725.495(c); *see also RB&F Coal, Inc. v. Mullins*, 842 F.3d 279, 281–82 (4th Cir. 2016).

[5] An "[i]nsurer or carrier means any private company, corporation, mutual association, reciprocal or interinsurance exchange, or any other person or fund, including

7

claim "unless it is dismissed by an adjudication officer and is not thereafter notified again of its potential liability." *Id.* A notified operator can accept or contest its identification as a potentially liable operator. 20 C.F.R. § 725.408(a)(1). To do so, the operator must give reasons for its disagreement, including whether it is "capable of assuming liability for the payment of benefits." 20 C.F.R. § 725.408(a)(2)(v).

After consideration of the evidence and any conference proceedings, the district director issues a proposed decision and order. 20 C.F.R. § 725.418. The proposed decision and order must "reflect the district director's final designation of the responsible operator liable for the payment of benefits." 20 C.F.R. § 725.418(d). The district director must dismiss all other potentially liable operators that received notification of the claim and were not already previously dismissed. *Id.*

If the designated responsible operator objects to the proposed decision and order, it may request that the decision be revised or ask, as the second stage of review, for a hearing before an ALJ. 20 C.F.R. §§ 725.419(a), 725.450, 725.360. If a hearing before an ALJ is requested, the district director must refer the claim to an ALJ for resolution of contested issues of law or fact. The ALJ makes findings of fact through briefs and evidence, hearing from witnesses and receiving documents transmitted by the district director. *See* 20 C.F.R. § 725.421; *Hobet Mining, LLC v. Epling*, 783 F.3d 498, 504 (4th Cir. 2015); *Edd*

---

any State fund, authorized under the laws of a State to insure employers' liability under workers' compensation laws." 20 C.F.R. § 725.101(a)(18).

*Potter Coal Co., Inc. v. Dir., Off. of Workers' Comp. Programs, U.S. Dep't of Lab.*, 39 F.4th 202, 208 (4th Cir. 2022).

But once a case is referred for ALJ consideration, the district director "may not notify additional operators of their potential liability," including those potentially liable operators that were dismissed. 20 C.F.R. § 725.407(d); *see also* 20 C.F.R. § 725.419(a). Further, "[d]ocumentary evidence pertaining to the liability of a potentially liable operator and/or the identification of a responsible operator which was not submitted to the district director shall not be admitted into the hearing record in the absence of extraordinary circumstances." 20 C.F.R. § 725.456(b)(1); *see also* 20 C.F.R. § 725.414(d). That means "even if the district director incorrectly identifies the responsible operator and refers the case to an ALJ, a new responsible operator may not be named." *Rockwood Cas. Ins. Co. v. Dir., Off. of Workers' Comp. Programs, U.S. Dep't of Lab.*, 917 F.3d 1198, 1215 (10th Cir. 2019); *see also Appleton & Ratliff Coal Corp. v. Ratliff*, 664 F. App'x 470, 473 (6th Cir. 2016) ("The appeal to an ALJ is the point of no return on the responsible operator designation."). So, if the operator prevails at the ALJ hearing or in subsequent proceedings, the matter cannot be remanded to the district director for the identification of a different responsible operator. *See Westmoreland Coal Co. v. Dir., Off. of Workers' Comp. Programs, U.S. Dep't of Lab.*, 696 F. App'x 604, 606 (4th Cir. 2017) ("The district director is precluded from changing his designation of the responsible operator after a claim has been referred to the Office of Administrative Law Judges for a hearing; thus, if an ALJ finds that a different operator should have been designated, the Black Lung Disability Trust Fund . . . must assume liability for the claim.").

9

But just because the district director is unable to change the operator designation, that doesn't mean the disabled miner is out of luck. Congress, in the Black Lung Benefits Revenue Act of 1977, created a trust fund to assume liability for the claim when no operator is found liable for the benefits. *See* 30 U.S.C. § 932(c); 26 U.S.C. § 9501; *see also Dir., Off. of Workers' Comp. Programs, U.S. Dep't of Lab. v. Trace Fork Coal Co.*, 67 F.3d 503, 506 n.6 (4th Cir. 1995). Thus, procedurally, if no operator is found at this stage, the Department should transfer the claim to the trust fund.

If any party is unhappy with the ALJ's decision, we move to stage three of these black lung proceedings. Any party can appeal the result to the Benefits Review Board. 20 C.F.R. § 725.481. But the Board is not "empowered to engage in a de novo proceeding or unrestricted review of a case brought before it." 20 C.F.R. § 802.301(a). "The Board is authorized to review the findings of fact and conclusions of law on which the decision or order appealed from was based" to ensure they are supported by substantial evidence. *Id.*

Finally, there is one more avenue for an aggrieved or affected party. It can seek review of the final Board decision by petitioning the United States Court of Appeals for the circuit in which the injury occurred. 33 U.S.C. § 921(c).

### B. Insurance

With that background in mind, we move to operators' statutory and regulatory obligations to pay black lung benefits. The Act's purpose is to "provide benefits, in cooperation with the States, to coal miners who are totally disabled due to pneumoconiosis and to the surviving dependents of miners whose death was due to such disease." 30 U.S.C. § 901(a); *see also W. Virginia CWP Fund v. Stacy*, 671 F.3d 378, 390 (4th Cir.

2011). To carry out that purpose, coal mine operators in states without qualifying workmen's compensation laws must secure the payment of benefits for which they are liable. 30 U.S.C. § 933. The operator can do this by "(1) qualifying as a self-insurer in accordance with regulations prescribed by the Secretary, or (2) insuring and keeping insured the payment of such benefits with any stock company or mutual company or association, or with any other person or fund, including any State fund, while such company, association, person or fund is authorized under the laws of any State to insure workmen's compensation." 30 U.S.C. § 933(a). In sum, a coal mine operator must keep sufficient assets to secure its obligations or have commercial insurance.

But the Act and related regulations treat self-insurance and commercial insurance differently. A quick review of the regulations will flesh out the differences between self-insurance and commercial insurance important to this appeal.

### 1. Self-Insurance

20 C.F.R. Part 726, Subpart B (§§ 726.101–726.115) addresses authorization of self-insurers. To self-insure, an operator must apply to the Department's Office of Workers' Compensation for authorization, and the application must include a list of the mines to be covered by any self-insurance agreement. 20 C.F.R. § 726.102. An operator approved to self-insure must submit security sufficient to cover the payment of its liabilities. 20 C.F.R. § 726.105. Along with security, the operator must execute and file an agreement and undertaking to demonstrate its intent to satisfy its obligations and liabilities. 20 C.F.R. § 726.110. The Department has discretion to approve or deny an application for self-insurance. 20 C.F.R. § 726.101(a). And if approved, self-insurance authorization only

11

lasts 18 months. 20 C.F.R. § 726.114.[6] Operators authorized to self-insure must apply for reauthorization for any period beyond the initial approval. *Id.*

## 2. Commercial Insurance

If an operator does not qualify as a self-insurer or elects not to, it can subscribe to and maintain a commercial insurance contract—either a policy or a contract procured from an insurance carrier or state agency. *See* 20 C.F.R. Part 726, Subpart C (§§ 726.201–726.213) (setting forth regulations on commercial insurance). The insurance agreement endorsement must attach language provided in the regulations that specifies the contract covers exposure-related diseases based on the insured's employment of miners during the policy period. 20 C.F.R. § 726.203(a). In addition, all insurance contracts must conform to the requirements of the Black Lung Benefits Act. *See* 20 C.F.R. § 726.203(c)(6). A carrier who writes insurance under these regulations shall be deemed to have agreed to be bound for full liability for obligations under the Act. 20 C.F.R. § 726.210; *see also Mullins*, 842 F.3d at 285.

## II.      Factual and Procedural History

With this legal background in mind, we turn, at last, to the facts of this case.

## A. Hobet and Arch

Horace Meredith had a 30-year coal mining career primarily doing above-ground work. His last employment as a miner was with Hobet, where he worked from 1990 through

---

[6] These descriptions reflect the regulations in place at the time the Department considered Meredith's claim and at the time of the decisions of the ALJ and the Board on review.

1995 as a surface coal mining mobile equipment operator. Meredith stopped working in November 1995 for health reasons.

During the five years that Meredith worked for Hobet, Arch owned Hobet and other mining subsidiaries. Arch covered its own black lung liabilities and those of its subsidiaries, including Hobet, with a self-insurance bond approved by the Department.

Roughly a decade after Meredith stopped working, Arch sold Hobet and two of its other subsidiaries to Magnum Coal. On January 5, 2006, as part of its self-insurance reauthorization update for itself and the subsidiaries it still owned, Arch notified the Department in writing that it sold Hobet and the two other subsidiaries—Catenary Coal and Apogee Coal—effective December 31, 2005. The notice advised that Magnum assumed "'all' liability (whenever created) for Federal Black Lung claims related to [those subsidiaries] after the closing date of December 31, 2005." J.A. 3203. It requested that the Department update its records to "reflect that [Arch] is no longer responsible for claims arising out of the liability of these subsidiaries and that [Magnum] is now the parent company responsible for all liability—past, present and future." J.A. 3203.

Magnum did not keep the mining subsidiaries long. In 2008, Patriot Coal Company purchased Magnum, Hobet and the two other subsidiaries. Patriot then applied for self-insurance. On its application for self-insurance authorization, Patriot listed Hobet and the other subsidiaries that Arch sold back in 2005 as operating active mines which would be covered by the self-insurance for that time period.

In January 2011, Patriot filed an agreement and undertaking with the Department as part of its self-insurance efforts. Two months later, the Department formally granted Patriot

13

authority to act as a self-insurer. In a follow-up letter, the Department approved the application to self-insure retroactively to July 1, 1973.

In June 2011, the Department reached out to Arch seeking information for re-authorization to self-insure. The Department asked Arch to specify the number of mines it owned, any changes in its corporate structure, the subsidiaries covered by the self-insurance and any operations no longer self-insured. In response, Arch submitted its self-insurance reauthorization documentation, repeating that it had sold Hobet and two other subsidiaries to Magnum in 2005. It requested that the Department remove Hobet and the other two subsidiaries it sold from the list of entities covered under the self-insurance program due to the sale to "Magnum/Patriot." J.A. 3215.

In January 2015, Arch responded to another request for information about self-insurance reauthorization from the Department. Again, it listed Hobet as a subsidiary released from Arch's self-insurance due to the sale and transfer of liability to Magnum. Arch also stated that "[Patriot] received official authorization from the [Department] around March 2011 to be a qualified self insurer and [Patriot's] coverage is retroactive to July 1, 1973 which includes the now Magnum subsidiaries." J.A. 3319.

A few years later, Patriot succumbed to financial troubles. In May 2015, Patriot filed for protection under the Bankruptcy Code. *In re Patriot Coal Corp.*, No. 15-32450-KLP, 2016 WL 5360950 (Bankr. E.D. Va. Sept. 23, 2016). As part of that proceeding, in October 2015, the bankruptcy court approved the sale of Patriot's coal mining operations. But the sale did not transfer all of Patriot's black lung benefits liabilities. In other words, Patriot

14

kept—but was unable to pay—many current and future claims of miners who worked for mines that it previously owned.

The next month, on November 12, 2015, the Department issued Bulletin No. 16-01 about the Patriot bankruptcy. The stated purpose of the Bulletin was to provide "guidance for district office staff in adjudicating claims in which the miner's last coal-mine employment of at least one year was with one of the 50 subsidiary companies that have been affected by the [Patriot] bankruptcy." J.A. 2405.

For claims filed after its issuance, the Bulletin instructs district staff to determine whether the claim is covered by "Arch Coal's self-insurance or an Arch Coal commercial insurance policy." J.A. 2407. It lists Hobet as a mining operation that was once an Arch subsidiary and that was "at one time, under the self-insurance authority of [Arch]" and/or also "covered, for a time, by commercial insurance policies." J.A. 2407. The Bulletin advises that if commercial coverage can be identified, the appropriate carrier should be notified. But if no commercial insurance can be identified, and if the miner's last employment fell within a period of Arch's self-insurance, the Bulletin directs notices of claim be sent to the subsidiary company and to Arch. If neither commercial insurance nor self-insurance is available, the Bulletin directs staff to transfer the claim to the trust fund for processing.

### B. Meredith's Claim

Meredith filed a claim for benefits under the Act on April 22, 2019, over 20 years after he last worked at Hobet. Consistent with the Bulletin's instructions, the district director generated a notice of claim listing "Hobet Mining Inc C/O Arch Coal Inc" as the

15

potentially liable operator, and "Arch Coal Company, Inc." as the "insurance carrier." J.A. 1. Hobet and Arch responded contesting the designation of Hobet as the responsible operator and Arch as the carrier for Hobet. They said Arch no longer self-insures Hobet's liabilities and did not have a relationship with Hobet after its 2005 sale to Magnum. Hobet and Arch also contested, among other things, Hobet's existence and the inability of Patriot to assume liability for the payment of benefits. They asserted that the trust fund was responsible for any liability for payment of benefits.

After the submission of evidence and review by the district director—throughout which Arch contested its inclusion as a proper party—the district director concluded that "[Hobet] is the coal mine operator designated as responsible for payment of benefits due the claimant." J.A. 189. Hobet and Arch requested a formal hearing before an ALJ.

Before the ALJ, the parties stipulated to all outstanding issues except "whether [Hobet] is the properly named responsible operator, and whether [Arch's] insurance covers Hobet's potential black lung liability." J.A. 561. The ALJ held that "[t]he evidence in the record reflects that Hobet, self-insured by Arch, meets the five regulatory requirements of a potentially liable operator." J.A. 566. The ALJ noted that "absent evidence to the contrary, Hobet is presumed to be financially capable of paying benefits [under the regulations]." J.A. 567. She then explained that the district director:

> need not establish the existence of such an [insurance relationship between Hobet and Arch]. The regulations require that it be presumed Hobet is financially capable of paying benefits. [] Employer has presented no evidence that Hobet is incapable of paying benefits, particularly through its self-insurance with Arch. There appears to be no dispute, as a factual matter, that Hobet itself is no longer in operation, and its assets and liabilities have been transferred elsewhere. Nonetheless, Employer failed to rebut the

16

presumption that Hobet, as self-insured by Arch, is financially capable of assuming liability. There is no evidence in the record indicating Arch, as Hobet's self-insurer, would be incapable of paying benefits.

J.A. 567. Thus, the ALJ concluded that Hobet was the responsible operator, having satisfied the requirements of a financially capable potentially liable operator, and that "Arch, as Hobet's self-insurer" at the time of Meredith's last employment, was responsible for paying any award. J.A. 567.

Arch petitioned the Board for review of the ALJ's decision. In a per curiam decision, the Board referred to Arch as the "responsible insurance carrier," J.A. 656, noting that the "[e]mployer does not challenge the ALJ's findings that Hobet is the correct responsible operator and was self-insured by Arch on the last day Hobet employed [Meredith]." J.A. 656–57. The Board recognized that Arch sold Hobet to Magnum and that Patriot then acquired both Magnum and Hobet. The Board also acknowledged that Patriot's last self-insurance authorization indicated that it was retroactively liable for Hobet claims. But it pointed out that Patriot—Hobet's parent at the time that Meredith filed his claim—could no longer pay those benefits after its bankruptcy. The Board then concluded that nothing relieved Arch of liability for paying benefits to miners last employed by Hobet when Arch owned and provided self-insurance to it. Accordingly, the Board affirmed the ALJ's decision and order awarding benefits stating that "Hobet and Arch are the responsible operator and carrier, respectively, and are liable for this claim." J.A. 658.

17

Hobet and Arch petitioned for our review of the Board's decision and order.[7]

## III.   Analysis

Hobet and Arch argue the Board erred in affirming the ALJ's finding that Hobet satisfied the requirement of being financially capable of assuming Meredith's benefits through Arch and in concluding that nothing relieved Arch of liability for benefits to miners last employed by Hobet when Arch owned and provided self-insurance for that operator. We agree. Subsection 725.494(e) specifies three ways an operator can be deemed financially capable of assuming benefits due to a miner. Hobet doesn't satisfy any of them. And neither the Act nor its regulations permit the Department to use the fact that Arch previously covered Hobet's black lung liabilities through a self-insurance bond to show

---

[7] The Black Lung Benefits Act, 30 U.S.C. § 932(a), incorporates the judicial review provision of the Longshore and Harbor Workers' Compensation Act, 33 U.S.C. § 921(c). That Act provides that "any person adversely affected or aggrieved by a final order of the Board may obtain a review of that order in the United States court of appeals for the circuit in which the injury occurred" by filing a petition within 60 days of the final order's issuance. 33 U.S.C. § 921(c). We review the Board's decision "to assess whether substantial evidence supports the factual findings of the ALJ and whether the legal conclusions of the [Board] and ALJ are rational and consistent with applicable law." *Harman Min. Co. v. Dir., Off. of Workers' Comp. Programs*, *U.S. Dep't of Lab.*, 678 F.3d 305, 310 (4th Cir. 2012) (quoting *Lewis Coal Co. v. Dir., Off. of Workers' Comp. Programs, U.S. Dep't of Lab.,* 373 F.3d 570, 575 (4th Cir. 2004)). We review the Board's legal conclusions de novo. *Id.* (citing *Island Creek Coal v. Compton*, 211 F.3d 203, 208 (4th Cir. 2000)). In conducting this analysis, we "undertake an independent review of the record," but must "confine [the] review to the grounds upon which the [Board] based its decision." *Daniels Co., Inc. v. Mitchell*, 479 F.3d 321, 329 (4th Cir. 2007) (internal quotation marks and citations omitted). "In black lung cases, our review of the Board's order 'is governed by the same standard the Board applies when reviewing an ALJ's decision.'" *Am. Energy, LLC v. Dir., Off. of Workers' Comp. Programs, U.S. Dep't of Lab*., 106 F.4th 319, 330 (4th Cir. 2024) (quoting *Boyd & Stevenson Coal Co. v. Dir., Off. of Workers' Comp. Programs, U.S. Dep't of Lab.*, 407 F.3d 663, 666 (4th Cir. 2005)).

that Hobet could pay Meredith's benefits or otherwise hold Arch responsible for Meredith's benefits.

## A. The ALJ and the Board Erred in Finding that Hobet Met the Regulatory Requirements for Being a Potential Liable Operator

Under 20 C.F.R. § 725.495(a)(1), a responsible operator must qualify as a potentially liable operator. And one of those qualifications is that an operator be financially capable of paying the miner's benefits. Importantly, 20 C.F.R. § 725.494(e) specifies three ways an operator can be financially capable. We described those back in the portion of the opinion when we encouraged readers to stay awake but repeat them here. An operator can be financially capable (1) through a commercial insurance policy (§ 725.494(e)(1)), (2) because it qualified as a self-insurer (§ 725.494(e)(2)) or (3) by having sufficient assets to secure the payment of benefits (§ 725.494(e)(3)). Subsections (e)(1) and (e)(3) are easy. No one suggests that Hobet had a commercial insurance policy that covered these benefits or that it has sufficient assets on its own to pay them. Instead, the ALJ's holding that Hobet was financially capable of assuming liability for Meredith's claim "through its self-insurance with Arch" appears rooted in subsection(e)(2)'s reference to self-insurance. J.A. 567.

But that subsection does not apply either. Subsection 725.494(e)(2) provides that an operator satisfies the financial capability requirement of a potentially liable operator if it "qualified as a self-insurer under section 423 of the Act and part 726 of this subchapter during the period in which the miner was last employed by the operator, *provided that the operator still qualifies as a self-insurer* or the security given by the operator pursuant

19

to § 726.104(b) is sufficient to secure the payment of benefits in the event the claim is awarded." (emphasis added). By its express terms, the regulation only applies to an operator that "still qualifies as a self-insurer." *Id.* Hobet was an operator long ago, but it doesn't still qualify as a self-insurer. In fact, it never did. On the other hand, Arch qualified as a self-insurer while it owned Hobet. But the Department never named Arch as an operator. And the ALJ specifically stated that "Arch bears liability for this claim *as Hobet's self-insurer*, not as the responsible operator." J.A. 569 (emphasis in original). Since § 725.494(e) applies only to operators, it does not apply here to Arch.

Maybe this reflects a statutory or regulatory gap where self-insurance comes from a parent corporation and not from the actual operator subsidiary. If so, Congress or the Department are capable of filling it with statutory amendments or new regulations. But the Department cannot just declare it filled.[8]

Thus, the ALJ's decision that Hobet satisfied the requirements of a potentially liable operator, and the Board's decision to affirm the ALJ, misconstrue § 725.494(e). Properly analyzed, Hobet does not meet any of these conditions for establishing financial capability

---

[8] Arch and Hobet argue that the ALJ's holding that Hobet was financially capable of assuming liability for Meredith's claim "through its self-insurance with Arch," J.A. 567, effectively pierces Arch's corporate veil making it liable as a parent corporation for the debts of its subsidiaries. That would, of course, be improper. Parent entities and subsidiary entities are not generally considered one and the same for purposes of liability unless a party establishes the factors required to pierce the corporate veil. *See generally United States v. Bestfoods*, 524 U.S. 51, 61–62 (1998). But the ALJ does not even purport to do that so we do not address this further.

20

to pay benefits. And without satisfying any of them, Hobet cannot, as a matter of law, be a responsible operator.[9]

### B. The Board Erred in Affirming the ALJ's Conclusion that Arch was Liable for Meredith's Benefits Because it Insured Hobet on Meredith's Last Day as a Miner

In response to Hobet and Arch's petition, the Department seeks to impose liability on Arch under a new and different theory. It maintains that the regulations impose liability on Arch because Arch covered Hobet's claims on the last day Meredith worked at the coal mine operator through its self-insurance. To reach this conclusion, the Department relies on regulations that apply to commercial insurance. The Department insists that under 20 C.F.R. §§ 725.494–95 and 726.203, the regulations impose commercial insurance liability based on what entity provided coverage on the last day of the miner's employment. It concedes the regulations that apply to self-insurance do not explicitly contain a similar provision. But according to the Department, a self-insurance regulation, 20 C.F.R. § 726.103, indirectly imposes the same requirements for self-insurance.

---

[9] The ALJ relied on § 725.495(b)'s presumption that, absent evidence to the contrary, the designated operator is presumed to be financially capable of paying benefits in accordance with § 725.494(e). The ALJ concluded that the "[e]mployer failed to rebut the presumption that Hobet, as self-insured by Arch, is financially capable of assuming liability." J.A. 567. She goes on to conclude that "[t]here is no evidence in the record indicating Arch, as Hobet's self-insurer, would be incapable of paying benefits." J.A. 567. But that misses the point. The issue was not Arch's financial capability; it was whether Hobet satisfied any of § 725.494(e)'s conditions for financial capability of assuming benefits. Arch's financial capability is not relevant under the text of that regulation. Thus, § 725.495(b)'s presumption doesn't change this analysis. And besides, even if the presumption did apply, the undisputed evidence and the legal principles we described earlier rebut it.

21

There are at least four problems with this argument. First, the Department did not make this argument to the ALJ or to the Board. We generally do not consider arguments raised for the first time before us because neither the Board nor the parties were put on notice of those issues and afforded an opportunity to consider them. *See Armco, Inc. v. Martin*, 277 F.3d 468, 476 (4th Cir. 2002); *Edd Potter Coal Co., Inc.*, 39 F.4th at 209. We see no reason to depart from that established practice here.

Second, as expected since the Department did not raise it, neither the ALJ nor the Board considered this issue in their decisions. In fact, the ALJ stated, contrary to the Department's new claim, that "the self-insurance regulations simply do not govern the imposition of liability. . . .Whether an operator complies with the insurance requirements[] or whether the Department properly administers these requirements[] does not initiate or terminate liability." J.A. 569–70. In affirming the ALJ, the Board never substantively mentioned or analyzed self-insurance regulations. It certainly never expressed any disagreement with the ALJ's conclusions. As a result, *Securities and Exchange Commission v. Chenery Corporation*, 318 U.S. 80 (1943) precludes us from affirming the Board's decision based on reasoning and grounds upon which the Board did not rely. *See Island Creek Coal Co. v. Henline*, 456 F.3d 421, 426 (4th Cir. 2006). "[I]n reviewing an order of the Board directing payment of black lung benefits, our review is confined exclusively to the grounds actually invoked by the Board." *Id.* (explaining the *Chenery* doctrine's application to black lung cases).

Third, even if we were to put aside these determinative roadblocks, the Department's argument fails on the merits. At the time of the decisions by the ALJ and the

22

Board, §726.103 read that "[a]s appropriate, each of the regulations, interpretations, and requirements contained in this part 726 including those described in subpart C of this part [the commercial insurance portion] shall be binding upon each applicant under this subpart, and the applicant's consent to be bound by all requirements of the said regulations shall be deemed to be included in and a part of the application, as fully as though written therein." To be sure, this provision is no model of drafting clarity. Even so, it does suggest that some regulations from the commercial insurance part of the regulations might apply to self-insurance. But only "as appropriate."

What then does "as appropriate" mean? Nate Bargatze might say, "nobody knows."[10] But we do not have the option of throwing up our hands. Without a statutory or regulatory definition, we look for its ordinary meaning. Dictionaries define "appropriate" as making sense given the particular situation or context. *See generally Appropriate*, FUNK AND WAGNALLS STANDARD DICTIONARY (int'l ed. 1973) ("Suitable for or belonging to the person, circumstance, or place; fit, proper, relevant"); *Appropriate*, WEBSTER'S NEW COLLEGIATE DICTIONARY (1st ed. 1973) ("especially suitable or compatible: fitting"). So, considering that ordinary meaning, does it make sense to apply § 726.203(a)'s requirement with respect to commercial policies and their federally required endorsement that links liability for a claim to the miner's last day of exposure to self-insurance? It does not.

There is nothing about endorsements in the self-insurance provisions. It is not "appropriate" to import to, and impose on, self-insurers provisions about endorsements

---

[10] Saturday Night Live, *Washington's Dream*, at 0:30 (YouTube, Oct. 29, 2023), https://youtu.be/JYqfVE-fykk [https://perma.cc/HCD8-PHKR] (last visited July 23, 2025).

23

when the self-insurance regulations do not even address that topic. In fact, doing so would seem to eliminate the differences between commercial insurance and self-insurance found in the regulations. Recall our earlier description of those two types of insurance—again, when we urged readers to stay awake. The regulations on self-insurance contain detailed procedures that are very different from the commercial insurance provisions. An application for self-insurance must be approved by the Department. It must list the mines to be self-insured. It must be accompanied by security that the Department deems sufficient to cover the self-insurance liabilities. If approved, the authority to self-insure lasted only 18 months. After that, a self-insurer must reapply with a current list of covered mines. *See* 26 C.F.R. §§ 726.105–14.

Nothing similar appears in the commercial insurance regulations. Those regulations do not contemplate the Department examining the financial security of the insurer. They do not ask for a security bond or a list of mines being insured. Instead, these regulations set forth substantive terms of the insurance that the commercial contract must contain. *See* 26 C.F.R. §§ 726.201–13; *see also Apogee Coal Co. v. Off. of Workers' Comp. Programs*, 113 F.4th 751, 756 (7th Cir. 2024) (recognizing the commercial endorsement provisions of 26 C.F.R. § 726.203(a) and noting that self-insurance arrangements operate differently). The Department's argument would mean that § 726.103's murky language nullifies these important differences between self-insurance and commercial insurance, effectively collapsing them into an atextual and uniform type of insurance. We see nothing in § 726.103 that would dictate such an extraordinary result. Indeed, reading § 726.103 in that way would not be "appropriate."

24

Aside from the general differences in the commercial insurance regulations and the self-insurance regulations, the regulations differ in terms of the specific issue presented here—what claims are covered by the insurance. The Department contends that § 726.203(a)'s requirement that all commercial policies contain a federally required endorsement that makes the insurer liable for a claim that accrued during the policy period based on the miner's last day of exposure also applies to self-insurance. The self-insurance regulations contain no such occurrence-based language. To the contrary, they suggest that the Department's approval of an application for self-insurance is based on current mines— not mines that are no longer self-insured. It would not be "appropriate" to impose a substantive obligation inconsistent with the self-insurance regulations.

Fourth, it would not be "appropriate" to impose the alleged occurrence-based coverage from § 726.203(a) on Arch based on the parties' conduct. Arch fully disclosed its sale of Hobet to the Department and stated that any self-insurance liability would lie with the purchaser, not Arch. Recall that in 2006 and 2011, Arch supplied the Department with written notification that it had sold Hobet and two other subsidiaries. The notices also indicated that the purchasers—Magnum and then Patriot—had assumed the subsidiaries' liabilities. Arch provided a list of "all companies to be covered by [Arch's] self-insurance authority" to include its primary mining operations and other subsidiaries. J.A. 3211. Hobet was not one of them. In response, the Department never objected. To the contrary, it approved Patriot's self-insurance application, even retroactively to 1973—a period that included Meredith's employment with Hobet.

25

In fact, the Department began looking to Patriot for the black lung claims of the subsidiaries it then owned, even for claims that pre-dated Patriot's acquisition, and assumption of insurance coverage, of the subsidiaries. For example, in October 2012, the Department issued a notice of claim for a miner who worked for one of the two subsidiaries that Arch sold to Magnum along with Hobet. J.A. 1378. The miner's employment with the subsidiary ended before Arch sold the subsidiary to Magnum. J.A. 1383. The notice listed that subsidiary as a potentially liable operator self-insured through Patriot. It never listed Arch as a self-insurer or provided it with any notice of that claim. Thus, prior to Patriot's bankruptcy, the Department treated current corporate parents of operators as insurers because they covered their own black lung liabilities and those of their subsidiaries under a self-insurance security; they did not designate entities, like Arch, that previously owned the subsidiaries as insurers.[11]

The facts here are essentially the same. Arch insured Hobet during the time Meredith worked at Hobet, which was his last employer as a miner. But Arch was not covering Hobet through its self-insurance at the time Meredith filed his claim. Arch sold Hobet and two other subsidiary mining operators to Magnum in 2005 and then Patriot purchased those entities in 2008. Arch disclosed this to the Department. In 2006 and again

---

[11] Arguably, current corporate parents do not fit one of the three conditions § 725.494(e) sets forth for showing financial capability. But we need not address that issue. What we need to decide—and do decide—is that it would not be appropriate for the Department to use § 726.203(a) to impose liability on Arch based on its self-insurance at the time Meredith last worked for Hobet when it acted contrary to that position until Patriot went bankrupt.

in 2011, it explained the sales and said that the Department's records needed to reflect the fact that those purchasers—not Arch—were covering the liabilities of Hobet and the other subsidiaries. Meredith did not file this claim until 2019, over 20 years after he last worked for Hobet and 13 years after Arch sold Hobet to Magnum.[12] Yet here, the Department now lists Arch, the prior parent, as a self-insurer, not the current parent.

Why the change? There is nothing legally different about this case. The only difference is that Patriot, the current parent of Hobet, was bankrupt when Meredith filed his claim. Practically, that may have meant Patriot was unable to pay the mining benefits. But it did nothing to create liability for Arch when none existed before.[13]

---

[12] Meredith filed a few prior claims for benefits but without success. For example, Meredith's 2010 claim for benefits prompted the district director to issue a notice of a claim listing "Hobet Mining, Inc./ Magnum Coal" as the potentially liable operator, and "self-insured" under the form's section for "Insurance Carrier/Address." J.A. 2998. Arch was notably absent from that notice.

[13] Perhaps recognizing the lack of regulatory support for the position it advances here, the Department has recently revised its regulations. Effective January 2025, the Department revised its self-insurance regulations for authorizing coal mine operators to "better protect the Trust Fund when a self-insured operator becomes insolvent," to eliminate "the need to continuously monitor each individual operator's financial situation" and to "clarify and add certainty with respect to OWCP's and operators' respective obligations in the self-insurance authorization process." Black Lung Benefits Act: Authorization of Self-Insurers, 89 Fed. Reg. 100304, 100305 (Dec. 12, 2024). The revised regulations require more security to approve an applicant for self-insurance. 20 C.F.R. § 726.105 (2025). They also require a self-insurer to notify the Department "of any changes to its business structure, including the purchase, sale, or lease of any coal mining operations, that could affect the operator's liability for benefits under the Act." 20 C.F.R. § 726.110(c) (2025). And the revised regulations require the Department to "notify the applicant of the date on which its authorization is effective, the date on which such authorization will expire, and the date by which the applicant must apply to renew such authorization if the applicant intends to continue self-insuring its liabilities under the Act." 20 C.F.R. § 726.111 (2025).

So, nothing in the regulations concerning black lung insurance justifies imposing liability on Arch for Meredith's benefits.[14]

### C. The Seventh Circuit's Reasoning in a Similar Case is More Persuasive than the Sixth Circuit's

We are not the first federal appellate court to assess Arch's liability as a prior self-insuring parent of mining subsidiaries for claims made after it sold the subsidiaries and after Patriot's bankruptcy. Our colleagues on the Sixth and Seventh Circuit have addressed essentially the same issue we face today. Those two courts diverged, with the Sixth Circuit concluding that Arch had liability, and the Seventh concluding it did not. We find the Seventh's Circuit's reasoning more persuasive.

In *Apogee Coal Company v. Office of Workers' Compensation Programs*, 113 F.4th 751 (7th Cir. 2024), a miner's last job in the coal industry was with Apogee Coal. At the time the miner worked there, Arch was Apogee's parent corporation. But Arch sold Apogee, along with Hobet, to Magnum and Patriot then acquired those entities. Later, Apogee and Patriot went bankrupt. *Id.* at 755. After that, the miner filed a black lung claim. Just like in our case, the district director designated Apogee, as the miner's last employer, as a potentially liable operator and declared that the former parent company, Arch, bore responsibility for paying the benefits. *Id.* at 756. The ALJ agreed with the district director, concluding that Apogee was the responsible operator despite its bankruptcy and that Arch

---

[14] Neither the ALJ, the Board nor the Department suggest the language or provisions of the self-insurance bond that Arch used to cover the black lung liabilities of it and its subsidiaries saddle Arch with continual liability for black lung claims filed by miners who worked at Hobet during the time it was owned by Arch. And our review likewise finds no contractual basis for imposing liability on Arch.

28

was liable for paying benefits because it provided self-insurance for Apogee at the time of the miner's last employment. *Id.* at 758. The Board affirmed. *Id.*

On review, the Seventh Circuit questioned how Apogee could satisfy the requirement of being capable of assuming liability for payment of continued benefits if it was defunct. *Id.* at 755. While recognizing a commercial black lung insurance policy might cover a claim against one of Patriot's bankrupt subsidiaries if it was in place on the last day the miner worked for a coal mine operator, the Seventh Circuit noted that Apogee was not covered by a commercial policy. *Id.* at 756. So, despite the Department naming Apogee as a potentially liable operator and Arch as the "insurance carrier" based on the "solvent parent corporation's self-insurance umbrella," the court held that there was no valid legal basis for treating self-insuring parent corporations like commercial insurers. *Id.* at 756. It explained, "[t]here must be some source of law (or perhaps combination of sources) that the Department can point to that affirmatively requires Arch to satisfy benefits owed . . . ." *Id*. at 759. Concluding there was no such source of law, the circuit court vacated the decision of the Board and remanded with instructions that the benefits be assigned to be paid by the trust fund. *Id.* at 762.

Facing essentially the same factual situation, the Sixth Circuit reached a different result. The Sixth Circuit affirmed the Board's conclusion that Arch was liable as a self-insuring parent for black lung benefits owed by a former subsidiary in denying the petition for review. *See Apogee Coal Co., LLC v. Dir., Off. of Workers' Comp. Programs, U.S. Dep't of Lab.*, 112 F.4th 343, 354 (6th Cir. 2024). The court concluded that whether Arch was a self-insurer or a corporate insurer did not alter the statutory requirements to pay

29

claims owed by an operator. *Id.* It relied on 20 C.F.R. § 726.4, which broadly identifies the pool of potentially liable parties and explains that an operator remains liable for benefits and must obtain insurance coverage for such claims. Even so, that regulation doesn't impose any obligation on a prior self-insuring parent company that is not the named operator.

The Sixth Circuit also leaned heavily on 20 C.F.R. § 726.110(a)(1), which explains that self-insurers must agree to pay, when due, all benefits payable under the Act. But again, that only invites the question of whether the self-insurer that must pay is the self-insurer at the time the claim was made or the self-insurer at the time the miner last worked for the operator. As described above, we see nothing in the Act or regulations that indicate the liability remains with a self-insuring parent after it ceases to own and insure its subsidiary operator.

Beyond that, the Board's decision here did not rely on the reasoning adopted by the Sixth Circuit. Thus, *Chenery* again precludes us from affirming an agency's decision based on reasoning the agency itself never articulated in its own administrative proceedings.[15]

---

[15] Hobet and Arch also argue the Department's issuance of Bulletin No. 16-01 improperly and retroactively changed the coverage trigger for self-insured mine operators to protect the trust fund. They argue that the Department did not follow Administrative Procedure Act rulemaking procedures and, thus, the Bulletin must be declared void. After the Bulletin issued, Arch filed an action in the district court for the District of Columbia challenging district directors' determinations that Arch was the responsible operator for numerous claims. *Arch Coal, Inc. v. Hugler*, 242 F. Supp. 3d 13, 17 (D.D.C. 2017). Arch argued the Bulletin was unlawful. In response, the Department argued that (1) the district court lacked jurisdiction because of Congress' administrative adjudication process that meant appeals went straight to the circuit court, and (2) alternatively, that Arch failed to state a claim. The district court granted the motion to dismiss for lack of jurisdiction and

Looking at our colleagues' decisions, therefore, reinforces our conclusion. We join the Seventh Circuit in its assessment of Arch's liability.

### D. The Dissent's Reasoning is Unpersuasive

Our friend in dissent contends that we have "created" a regulatory gap out of "whole cloth," all to the detriment of Meredith and the trust fund. Diss. Op. at 33. Yet besides lauding coal miners as "hardworking" and "long-revered,"[16] he fails to explain how our analysis is wrong. *Id.* at 33, 37. What's more, our opinion does not harm Meredith. It changes nothing about the amount of benefits he will receive; it just directs that they be paid by the trust fund rather than by Arch. As for the trust fund, it will indeed be forced to pay Meredith's benefits. But that is only because Congress set it up to pay benefits where no operator can be found liable or made to pay, which is just this type of situation. *See Dir., Off. of Workers Comp. Programs, U.S. Dep't of Lab. v. Consolidation Coal Co.*, 923 F.2d 38, 40 n.1 (4th Cir. 1991).[17]

---

did not reach the failure to state a claim argument. The D.C. Circuit affirmed, concluding that Arch had to exhaust its administrative remedies before coming to federal court. *Arch Coal, Inc. v. Acosta*, 888 F.3d 493, 496 (D.C. Cir. 2018). But in ruling on the exclusivity of the review scheme, the court characterized Arch's challenges to the Bulletin as objections to "an enforcement policy, not a legislative 'rule.'" *Id*. at 501. Similarly, we conclude the issues Arch presses in this appeal may stem factually from the operation of the Bulletin, but do not, at least at this point, implicate the APA.

[16] Whether coal miners are hardworking and/or long-revered is of course legally irrelevant. Even so, our opinion should not be construed to disrespect them in any way. *See Am. Energy, LLC*, 106 F.4th at 327 n.2 (acknowledging the difficulties of making a living mining coal generally and as reflected in Dwight Yoakam's song *Miner's Prayer*).

[17] Arch argues the financial troubles of the trust fund are the Department's own doing in failing to require adequate financial assurances of self-insurers generally and in

31

The dissent also contends we have substituted our judgment for that of the Board. Diss. Op. at 35. Our interpretation of the Act and its regulations, however, involve questions of law. We do not defer to the Board on legal issues. *See Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 401-404 (2024); *see also Kisor v. Wilkie*, 588 U.S. 558, 578 (2019).

## IV.     Conclusion

For the reasons described above, the Board erred in affirming the ALJ's decision. Hobet is not the responsible operator, and Arch is not responsible for paying the benefits owed to Meredith. Thus, we grant the petition for review, vacate the decision below and remand to the Board for proceedings in accordance with this decision.

*PETITION GRANTED; BOARD DECISION VACATED AND REMANDED*

---

its handling of Patriot's bankruptcy. Petitioner's Brief at 6, 36. But who is responsible for any financial troubles of the trust fund has no bearing on our decision. Our duty is to follow the law regardless of the culprit. We leave oversight of the financial condition of the trust fund to Congress, where it belongs.

32

KING, Circuit Judge, dissenting:

The Black Lung Benefits Act grants the Secretary of Labor broad discretion for determining a coal miner operator's liability for black lung benefits. *See* 30 U.S.C. § 932(h). Such benefits provide support for coal miners and their families when coal miners are disabled by pneumoconiosis, a horrific and life-threatening disease commonly referred to as "black lung." To that end, Congress intended for coal mine operators to shoulder the costs of those benefits through either commercial insurance or self-insurance.

As a backstop to ensure that the hardworking coal miners in our Country receive their black lung benefits, Congress created the Black Lung Disability Trust Fund as a last-resort safety net — to be used *only* when employer liability cannot be established. Departing from Congress' design, my friends in the majority have created — seemingly from whole cloth — a regulatory gap that will allow self-insured coal mine operators to shirk responsibility for paying countless black lung benefits claims. As a result, they turn the Trust Fund into a slush fund for those operators. It is unquestionably a wonderful thing that claimant Horace Meredith — a totally disabled coal miner with over 30 years in the surface and underground coal mines of West Virginia — will receive the black lung benefits to which he is entitled. But this misguided decision will undermine an array of claims of similarly situated disabled coal miners and result in a full-scale raid on the Trust Fund.[1]

---

[1] To be sure, the coal mine operators' lawyer in this appeal acknowledged in oral argument on March 18, 2025, that the Trust Fund is presently "underfunded." *See* Oral Argument at 18:13. That acknowledgment underscores the additional pressure that today's

In my view, the administrative record underlying this appeal is simply airtight: consistent with the applicable law and regulations, the ALJ in Mr. Meredith's case readily found that not only is Hobet the "responsible operator," but Arch Coal — as Hobet's self-insurer — is liable for paying his black lung benefits. *See Decision and Order Awarding Benefits, H.K.M. v. Hobet Mining*, Dkt. No. 2021-BLA-05075 (Dep't of Lab. Nov. 25, 2022). As the ALJ ruled, there is "no regulatory basis to refute . . . that Arch is liable here because it provided Hobet's self-insurance while [Mr. Meredith] was employed by Hobet, and Hobet, as owned and self-insured by Arch, meets the requirements of a potentially liable operator." *Id.* Notably, the ALJ — very well-seasoned in such matters — had little difficulty resolving that, even if Hobet's "assertions about general principles of corporate and insurance law are correct, black lung liabilities are *very specifically regulated*, and an [ALJ] is bound to apply those regulations." *Id.* (emphasis added).

The ALJ's well-reasoned decision was thereafter affirmed — in a *unanimous* fashion — by the Benefits Review Board, the agency tasked by Congress with reviewing such administrative decisions concerning black lung benefits claims. And the Board had no trouble affirming the ALJ's well-supported factual findings, specifying that

> Hobet is the correct responsible operator and was self-insured by Arch on the last day Hobet employed [Mr. Meredith.]

---

decision will place on the already-struggling Trust Fund. Furthermore, any "underfunding" of the Trust Fund arises, at least in part, from mine operators transferring hundreds of millions of dollars in black lung benefits liability to the Trust Fund. *See* U.S. Gov't Accountability Off., GAO-19-622T, *Black Lung Benefits Program: Financing and Oversight Challenges Are Adversely Affecting the Trust Fund* (recognition by GAO in 2019 that "[s]ince 2014, an estimated black lung benefit liability of over $310 million has been transferred to the Trust Fund from insolvent self-insured coal mine operators").

J.A. 656.[2]  As a result, Arch Coal — *not* the Trust Fund — should be liable for paying Mr. Meredith's black lung benefits.  Recognizing that it had "previously considered and rejected [the same] and similar arguments under the same determinative facts," the Board, faithfully abiding by three of its prior decisions, affirmed "the ALJ's determination that Hobet and Arch are the responsible operator and carrier" in Mr. Meredith's case, such that Arch Coal — as Hobet's self-insurer — should be responsible in this case.  J.A. 658.

We are called to determine whether the Board and the ALJ have rendered correct decisions in Mr. Meredith's case. As this Court has recognized, our review of administrative proceedings, pursuant to the Black Lung Benefits Act, is — in a single word — "limited."  *See Harman Min. Co. v. Dir., Off. of Workers' Comp. Programs*, 678 F.3d 305, 310 (4th Cir. 2012).  Put succinctly, our Court must affirm such decisions if "substantial evidence supports the factual findings of the ALJ," and if the "legal conclusions of the Board and ALJ are rational and consistent with applicable law." *Id.* (internal quotation marks omitted); *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) ("Ultimately, it is the duty of the administrative law judge reviewing a case, and *not* the responsibility of the courts, to make findings of fact and to resolve conflicts in the evidence." (emphasis added)).

Notwithstanding this "*deferential* standard of review," *see Harman Min. Co.*, 678 F.3d at 310 (emphasis added), the majority has substituted its judgment for that of the Board and the ALJ.  Painting with linguistic prose akin to the artistic stylings of Norman

---

[2] Citations to "J.A. ___" refer to the contents of the Joint Appendix filed by the parties in this administrative appeal.

Rockwell, the majority characterizes the regulations promulgated under the Black Lung Benefits Act as complicated gibberish. Yet despite the majority's best efforts at muddying the waters, the issue posed in this administrative appeal is quite simple: which entity pays Mr. Meredith's claim for black lung benefits — Arch Coal or the Trust Fund?

To answer that question, we need not venture too far down the mine shaft: (1) Hobet employed Mr. Meredith from 1990 until he retired in 1995; and (2) on Mr. Meredith's final day of work as a coal miner, Arch Coal was Hobet's self-insurer for black lung benefits. On the bases of these undisputed facts, the Board and the ALJ capably applied the applicable law and deemed Hobet the "responsible operator" in Mr. Meredith's case, and Arch Coal — as Hobet's self-insurer — liable for his black lung benefits. It is that simple.

Furthermore, by ginning up needless complexity where none exists, the majority has regrettably placed our Court on the wrong side of an ever-deepening circuit split, between the Sixth and Seventh Circuits. *Compare Apogee Coal Co., LLC v. Dir., Off. of Workers' Comp. Programs, U.S. Dep't of Lab.*, 112 F.4th 343 (6th Cir. 2024), *cert. denied sub nom. Arch Res., Inc. v. Pennington*, No. 24-784, 2025 WL 1496489 (U.S. May 27, 2025), *with Apogee Coal Co. v. Off. of Workers' Comp. Programs*, 113 F.4th 751 (7th Cir. 2024). To be sure, contrary to the majority's erroneous decision, the Sixth Circuit reached the same conclusion that I would reach in these administrative proceedings: that Arch Coal — as the self-insurer of Hobet — should be responsible for Mr. Meredith's black lung benefits, irrespective of the corporate maneuvering by Arch to avoid such liability. *See Apogee Coal Co.*, 112 F.4th at 354 (recognition by Sixth Circuit that "principles of 'corporate separateness' found elsewhere in the law do not change the statutory obligations

36

at play here," such that Arch's "identity as a self-insurer, rather than a corporate insurer, does not alter the statutory requirements for paying claims owed by an operator").

Make no mistake about it: the only thing the majority "puts to sleep" is the continued vitality of the Trust Fund. By its destabilizing decision upending the sound rulings of both the Board and the ALJ, my good friends in the majority accord these mine operators a perverse opportunity to dip into the Trust Fund. Nevertheless, the self-insurer, Arch Coal, can — and more importantly, *should* — be responsible for such black lung benefits.[3]

\* \* \*

For the sake of the long-revered coal miners of West Virginia and our Country, I would deny the petition for review and simply affirm the Board and the ALJ.

I wholeheartedly dissent.

---

[3] Although my colleagues of the panel majority have been careful to emphasize that Mr. Meredith's benefits will continue to be paid — but by the Trust Fund rather than by Arch Coal as the responsible operator — that story is strikingly incomplete. Congress established the Trust Fund to be used only as a last resort. Black lung benefits of disabled coal miners are supposed to be paid by the responsible operators. And the "underfunded" and already-struggling Trust Fund, as explained in the dissent's initial footnote, is financially vulnerable. *See ante* at 33 n.1 (emphasizing recognition that "[s]ince 2014, an estimated black lung benefit liability of over $310 million has been transferred to the Trust Fund from insolvent self-insured coal mine operators"). Because Congress specifically intended that the responsible operators are liable for the disability benefits of disabled coal miners, that means, in these proceedings, that defendant Arch Coal should pay Mr. Meredith's benefits.

37